# In the United States Court of Federal Claims

No. 11-690 C

(Filed **Under Seal** October 7, 2012)

(Reissued November 19, 2012)

| | |
|---|---|
| SCIENCE APPLICATIONS INTERNATIONAL CORP.,        Plaintiff, <br><br> v. <br><br> THE UNITED STATES,        Defendant, <br><br> MISSION ESSENTIAL PERSONNEL, LLC, <br><br> LINC GOVERNMENT SERVICES, L.L.C., <br><br> GLOBAL LINGUISTIC SOLUTIONS, LLC, <br><br> NORTHROP GRUMMAN TECHNICAL SERVICES, INC., <br><br> CACI PREMIER TECHNOLOGY, INC. <br><br> and <br><br> L-3 SERVICES, INC., <br><br>        Intervenor Defendants. | Post-award bid protest; deference to Agency adjectival ratings; disparate treatment; technically unacceptable; best value; prejudice. |

*Joseph G. Billings*, Baltimore, MD, for plaintiff.  *Alfred M. Wurglitz*, Rockville, MD, of counsel. *Nathanael D. Hartland* and *Rita J. Piel*, Baltimore, MD, of counsel.

*Jacob A. Schunk*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, and *Seth W. Greene*, of counsel.

*Craig A. Holman*, Washington, DC, for intervenor defendant Mission Essential Personnel, LLC. *Stuart W. Turner*, *William S. Speros*, and *Emma V. Broomfield*, of counsel.

*Sean D. Forbes*, Houston, TX, for intervenor defendant Linc Government Services, L.L.C. *Bryant S. Banes*, of counsel.

*Richard J. Vacura*, McLean, VA, for intervenor defendant Global Linguistic Solutions, LLC. *K. Alyse LaTour*, *Susan J. Borschel* and *Keric B. Chin*, of counsel.

*Richard P. Rector*, Washington, DC, for intervenor defendant Northrop Grumman Technical Services, Inc.

*Daniel J. Donahue*, Washington, DC, for intervenor defendant CACI Premier Technology, Inc.

*Daniel E. Chudd*, Washington, DC, for intervenor defendant L-3 Services, Inc. *Kevin C. Dwyer* and *W. Jay De Vecchio*, of counsel.

---

## OPINION AND ORDER [1]

**Merow**, *Senior Judge.*

## Introduction

Reference is made to the background and procedural history of this procurement protest, involving a proposal to supply foreign language support services, detailed in the court's prior Opinion, which will not be repeated. *Sci. Applications Int'l Corp. v. United States*, 102 Fed. Cl. 644-48 (2011) (denying

---

[1] This Opinion was issued under seal on October 7, 2012. The parties were requested to propose appropriate redactions of confidential or proprietary information and have done so. The Opinion and Order issued today incorporates the parties' proposed redactions. Redacted material is blackened.

defendant's motion to dismiss and denying in part plaintiff's motion to supplement the administrative record).

Thereafter, Science Applications International Corporation (SAIC) filed a Motion for Judgment on the Administrative Record (AR). (ECF No. 78.) Cross-motions for Judgment on the AR were subsequently filed by intervenors Global Linguistic Solutions, LLC (GLS), Mission Essential Personnel, LLC (MEP) and defendant. (ECF Nos. 82, 84 & 85.) Oppositions and Replies were filed followed by oral argument.

SAIC contends that the Army's ratings of its proposal at issue were arbitrary, capricious, inconsistent with stated evaluation criteria and in violation of law; the evaluation board either misunderstood, ignored or failed to read its proposal and applied the Solicitation standards unequally, treating SAIC's proposal more harshly than others, which lead, either singly or in combination, to its Unacceptable rating(s) and its below-the-award line ranking. SAIC does not contest the award of indefinite delivery, indefinite quantity (IDIQ)[2] contracts to other companies submitting proposals in this procurement, but theorizes that absent these asserted errors, it too would have been awarded a contract.

Defendant and moving intervenors, IDIQ contract awardees, contend that the Army's procurement decisions were neither arbitrary, capricious, an abuse of discretion, a violation of statute or regulation, nor the product of disparate application of Solicitation terms. It is argued that the Army's determination not to award a contract to SAIC was coherently and rationally articulated, well within the parameters of the Army's discretion and grounded in requirements of the Solicitation.

**Solicitation Requirements**

The Solicitation required each proposal be submitted in six volumes, which after the initial volume devoted to general, introductory, summary data and the like, corresponded to five evaluation factors which were, in descending order of evaluative weight: Management, Technical, Past Performance, Small Business and Cost/Price. (AR 908-09, 946.) Offerors were admonished that "[a]ny information that is included in the wrong volume will not be considered." (AR 915.)

---

[2] A list of acronyms is appended to this Opinion.

Management, the most heavily-weighted factor, had four subfactors, which were in order of weight: Management Plan, Staffing Plan, Transition Plan and Security Plan. The IDIQ contracts to be awarded required translation and interpretive services "without a well defined timeframe or quantity for delivery." (AR 747, §

[3/]

1.0.) Evaluation would be gauged by performance standards including:

- "accurate [] translation and interpretation services (with actionable data involving combat operations having the highest fidelity)."

- "consecutive interpretation, into, from and between the Specified Contract Required Language(s) (SCRL) and English."

- "written translation of general and technical material into and from English and the SCRL(s)."

- "transcription of aural SCRL(s) materials into written form."

- "idiomatic translations of non-technical material using correct syntax and expression from English to the SCRL language(s) or vice versa."

(AR 748.) Required performance standards included 98% accuracy; 100% security clearances; 95% recruitment, evaluation, staffing and hiring; and 90% customer satisfaction. (AR 751-54.) Specific requirements of the Management subfactors were articulated.

M.3.3.1.1 Subfactor 1 - Management Plan: The offer will be evaluated to assess its approach to manage the tasks required under the PWS [Performance Work Statement], Section C.3/J.2.3. The offeror

---

[3/] "In addition to the objectives contained herein, task orders issued against DLITE [Department of Defense Language and Interpretation Translation Enterprise] contracts may contain objectives specific to their missions." (AR 748, § 1.5.)

[4/] Section C.3 (AR 747-54) includes the IDIQ performance requirements; section J.2.3 (AR 873-87) includes the requirements for STO Charlie, an hypothetical task order including proposed staffing. In its Complaint, SAIC asserts the performance requirements for STO Charlie were result, rather than management, oriented and differed from those at the IDIQ level.

(continued...)

should explain in detail its management approach to: managing all proposed subcontractors; managing the deployment of linguists to OCONUS [outside the continental United States] locations as required; managing risk; controlling and reducing cost; managing all deliverables required by the PWS, and performing all tasks required by the PWS.

M.3.3.1.2 Subfactor 2 - Staffing Plan: The offer will be evaluated on the proposed approach to provide a fully qualified work force at contract award as well as the offeror's demonstrated ability to recruit, train, and retain sufficient numbers of linguists with required skill sets to support the DLITE requirements. The Plan will also be evaluated for its completeness regarding the technical qualifications, knowledge, and skills of proposed personnel and how well they correlate to the linguist capability requirements of the PWS.

---

4/ (...continued)

34.   The stated requirements of each STOs PWS (at the task order level) were different from the requirements of each overall mission area PWS (at the IDIQ contract level.)

35.   The IDIQ-level PWS for Force Projection Operations included a Performance Requirements Summary ("PRS") specifying performance metrics, such as ensuring that needs were filled within certain time periods at least 98% of the time; various recruiting statistics; completing timely invoices with less than a 2% resubmission rate; timely notifications regarding spend rate deviations and paying subcontractors timely 100% of the time. *Id.*, § C.3, ¶ 4.0.

36.   The STO-Charlie (task order level) PWS included a separate PRS also specifying performance metrics. *Id.*, § J.2.3, ¶ 3.0.

37.   The RFP [Request for Proposals] did not require offerors to propose a particular, specified approach to manage contract performance. The RFP specifically provided that "the PWS structured the acquisition around 'what' services or quality levels were required, as opposed to 'how' the contractor should perform the work (i.e., results, not compliance)." *Id.*, § J.1.7 "Quality Assurance Surveillance Plan." The RFP acknowledged that this performance-based approach represented a significant shift from a more traditional "quality assurance" approach. *Id.*

(Compl.10-11, ECF No. 1-2.) While these allegations were repeated in SAIC's Statement of the Facts (ECF No. 78-1) filed with its Motion for Judgment on the AR, the points were not substantively advanced thereafter.

M.3.3.1.3 Subfactor 3 - Transition Plan: The offer will be evaluated for the soundness of the offeror's approach for a seamless transition between contracts and task orders and its proposed approach and execution to the transfer of tasks between contractors. The Plan will also be evaluated for the offeror's understanding of the Army and INSCOM's operational environment and the thoroughness of its approach in addressing the planning and execution of transition issues, and how well it manages risk in this area. The offer will be evaluated on its capability for attaining the transition performance objectives in the [PRS] at paragraph 4.0 of the Force Projection Operations PWS.

M.3.3.1.4 Subfactor 4 - Security Plan: The offer will be evaluated to determine the offeror's understanding of, and its commitment to meeting, the security requirements of the proposed contract, including how the offeror will meet Government industrial, personnel, physical and information security.

(AR 948-49.)

Next in relative weight was the Technical factor with three subfactors, in descending order of importance:

M.3.3.2.1 Subfactor 2.1 - IDIQ Technical Approach: Offerors will

be evaluated based upon their technical approach to [5/] performing the tasks described in the PWS. Offerors are cautioned to not simply parrot back the PWS.

M.3.3.2.1 Subfactor 2.2 - Sample Task Order Charlie Technical Approach: Offerors will be evaluated based upon their technical approach to performing the tasks described in the PWS for STO Charlie. Offerors are cautioned to not simply parrot back the STO Charlie PWS.

M.3.3.2.1.2 Subfactor 2.3 - Quality Control Plan (QCP): The QCPs will be evaluated relative to the degree in which the offeror can

---

[5/] This subfactor was 51 percent of the total Technical factor rating. (AR 1714-15.)

demonstrate its methodologies for ensuring sustained quality improvement. The offeror shall submit a QCP for measuring and attaining quality of performance under this contract. The offeror's QCPs will be evaluated on their approach for maintaining a quality control system that is integrated into the overall management approach and meets the requirements of the PWS and STO-C. Each QCP will be evaluated on how well it demonstrates a comprehensive, verifiable, and self-implementing approach for monitoring the offeror's performance.

(AR 949, § M.3.3.2 (footnote supplied).)

All other-than-cost factors, when combined, were more important than price. (AR 946.)

The Technical factor volume required a response to Performance Work Standards (PWSs) for a hypothetical sample task order (STO) "Charlie" (STO Charlie) "to be used for evaluation purposes" (AR 873), which would be evaluated for the specifics of performing that TO. STO Charlie required the deployment of more than 7,500 linguists in a host of language and dialect proficiencies, in place in Afghanistan and surrounds, within ninety days of notice and half that number within thirty days. (AR 884, 881.) Linguists would provide written and oral interpretation, including assistance to American forces literally at the battle front, accompanying forward forces entering local structures, informing natives how to avoid further harm and providing other written and oral interpretative services. Language assistance would also be provided to "U. S. Forces to communicate with other foreign military units as well as interact with the host nation government and local populace to gather information for force protection . . . . [T]he objective [was] to provide linguist support services to meet ongoing, new, and/or changing mission requirements in the harsh and hostile environment of the Afghan region, to include related requirements and missions." (AR 873.)

Although STO Charlie was notional (abstract/conceptual), it was clear that performance would be challenging and carried out in harsh and dangerous environs.

Specific work hours or duration are not predictable. Contractor personnel may be required to live and work in harsh and hostile environments, and may be required to remain in the area of military

> operations for the duration of that mission. The contractor may be required, in the event of extraordinary conditions, to provide interpretation and translation services to their assigned military unit or organization up to 24 hours per day, seven (7) days per week. During ordinary conditions, interpreters and translators shall work at their assigned site for a minimum of eight (8) hours per day, which can be extended up to a total of 12 hours per day and to on-call status for the remaining 12-hours. The contractor program manager and all contractor on-site representatives shall be available 24 hours per day.

(AR 873, § 1.3.2.)

> The technical level of language proficiency was demanding.

> Interpreters must possess the command of English, the SCRL[6] language, and at least one of the official Afghanistan languages, (Pashto and Dari Persian, including all dialects) the source languages, is [sic] prerequisite. The interpreter must be able to (1) comprehend both the SCRL and source languages as spoken and written (if the language has a script), (2) speak both of these languages, (3) choose an expression in the SCRL language that fully conveys and best matches the meaning of the source language, (4) have familiarity with the cultural context of both languages, (5) have knowledge of terminology in specialized fields, (6) observe protocols applicable to different settings, and (7) master the modes applicable to these settings.

(AR 874, § 1.5.1 (footnote added).) The numbers of linguists with language, dialect, proficiency and security requirements in four categories of assignment to one of

---

[6] Specified Contract/Task Order Required Language(s). (AR 748, § 2.1.3.2.)

[7] Linguists were required to have native proficiency in the required language at "Interagency Language Roundtable (ILR) level 3 to 5." (AR 780, § H.36.) Category I (CAT I) linguists could be local or outside the immediate theater of operations and must be proficient in English. No security clearance was required. Category II (CAT II) linguists must be proficient in English, screened and United States citizens with interim security clearances. Category III (CAT III) required a higher level of proficiency in English and ability to accurately comprehend conversations of educated natives, (continued...)

eight different forces or commands, were depicted in a two-and-a-half page chart of approximately thirty different combinations of language/dialect requisites. (AR 884-87.) For example, the numbers of CAT II linguists for Pashto/Dari at eight different assigned commands or locations were:

- Combined Joint Task Force-82: 234 linguists;
- Combined Joint Special Operations Task Force-A: 62 linguists;
- International Joint Command: 262 linguists;
- Combined Security Transition Command-A: 19 linguists;
- International Security Assistance Force: 20 linguists;
- SURGE: 160 linguists;
- Pakistan: 3 linguists;
- United States Forces-A: 99 linguists.

(AR 885-86 (formatting altered).)

The Source Selection Plan (SSP) authorized the Source Selection Evaluation Board (SSEB) to review and rate each proposal individually, assign adjectival ratings and document its process, rationale and conclusions. (AR 1566, 1570.) The SSEB had four evaluation panels: Management and Technical, Past Performance, Small Business and Cost/Price, corresponding to the respective evaluation factors. (AR 1565, 1570, 1572.) Although there were different evaluation panels, the panels were the same for each offeror. The SSEB's reports were reviewed by the Source Selection Authority (SSA) which made the final source selection decisions. (AR 1564-65.) [8]

Adjectival ratings were:

---

[7] (...continued)
make and answer telephone calls, understand radio and other broadcast transmissions and some oral technical reports. Generally, CAT III linguists had to be United States citizens with top secret clearances. (AR 780-81.) STO Charlie specified that primarily oral translation was required for CAT I linguists. US CAT I linguists assigned to Central Command (USFOR-A) [United States Forces Afghanistan] had to be hired in, and a resident or citizen of, the United States. (AR 884.)

[8] The Management and Technical and Past Performance Evaluation Panels each had four members; there was one member on the Small Business Evaluation Panel; the Cost/Price Evaluation Panel had five members; and the Source Selection Advisor Council (SSAC) had six members. (AR 1580-81.)

- **Outstanding** – A proposal that satisfies all of the Government's requirements with extensive detail to indicate feasibilty of the approach and shows a thorough understanding of the problems and offers numerous significant strengths, which are not offset by weaknesses, with an overall low degree of risk in meeting the Government's requirements.
- **Good** – A proposal that satisfies all of the Government's requirements with adequate detail to indicate feasibility of the approach and shows an understanding of the problems and offers some significant strengths or numerous minor strengths, which are not offset by weaknesses, with an overall low to moderate degree of risk in meeting the Government's requirements.
- **Acceptable** – A proposal that satisfies all of the Government's requirements with minimal detail to indicate feasibility of approach and shows a minimal understanding of the problems with an overall moderate degree of risk in meeting the Government's requirements.
- **Marginal** – A proposal which satisfies most of the Government's requirements with minimum detail to indicate feasibility of approach and shows a minimal understanding of the problems with an overall moderate to high degree of risk in meeting the Government's requirements.
- **Unacceptable** – A proposal that contains a major error(s), omission(s) or deficiency(ies) that indicates a lack of understanding of the problems or an approach that cannot be expected to meet requirements and none of these conditions can be corrected without a major rewrite or revision of the proposal.

(AR 1573 (non-substantive edits made to enhance readability)).)

Other relevant definitions were:

- **Deficiency** – A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.

. . .

- **Significant Strength** – A strength that appreciably enhances the merit of a proposal or appreciably increases the probability of successful contract performance.
- **Significant Weakness** – A flaw that appreciably increases the risk of unsuccessful contract performance.
- **Strength** – Any aspect of a proposal that, when judged against a stated evaluation criterion, enhances the merit of the proposal or increases the probability of successful performance of the contract.
- **Weakness** – A flaw in the proposal that increases the risk of unsuccessful contract performance.

(AR 1571-72.)

Comparison of proposals was not permitted. "Proposals will not be compared against each other at any point in the source selection process, except in comparing cost/price should the information be appropriate to assist the SSA and/or the [Contracting Officer] in the performance of their responsibilities." (AR 1570.)

Unacceptable proposals were not eligible for an award.

To award a contract, the Government must have received an acceptable offer. An offer is acceptable when it meets all of the material terms and conditions of the RFP, which includes the solicitation provisions, contract clauses, specifications, and documents, exhibits, and attachments.

(AR 907, § L.4.3.2.)

The source selection process was robust and "designed to foster an impartial and comprehensive evaluation of offerors' proposals, leading to selecting the proposal that represents the best value to the Government." (AR 1564.) The SSEB members "completely read each [of the eleven proposals received] at least once for content, and then a second time to identify strengths, weaknesses, deficiencies and risks to determine the offeror's merit and acceptability in accordance with the criteria for each evaluation factor." (AR 1712.) Ratings were by consensus.

During the evaluation, members:

• Examined each proposal individually in detail against the evaluation factors and subfactors set forth in the Solicitation.
• Identified, reviewed, and assessed each proposal for strengths, weaknesses, deficiencies, and risks in accordance with the stated evaluation criteria.
• Identified when an offeror described in general terms a particular approach but had not provided enough detail about its feasibility or merit.
• Identified and documented any ambiguous proposal language or instances in which the offeror had not provided enough information to evaluate.

The final rating of each proposal was determined by a team consensus among the evaluators. Each member discussed their individual evaluations of the proposals, while giving one another the opportunity to convince, or be convinced, when there were significant differences of opinion.

(*Id.*)

"On May 31, 2011, the SSEB provided the SSAC with its evaluation results." (AR 1992.) Upon independent review, the SSA concluded the SSEB report was

"reasonable, consistent with the stated evaluation criteria, and adequately documented. Therefore, I adopt the evaluation findings and conclusions of the SSEB as part of my best value tradeoff determination here." (AR 1994.) Affirming the decision of the SSEB, the SSA concluded that there was a "clear break" in the quality of the proposals between the top six offerors and the remaining five and IDIQ contracts were awarded to the top six.

[A] clear quality break exists in the overall merit of offerors' proposals between the top six offerors' proposals, and the bottom five proposals. Specifically, the proposals of MEP [Mission Essential Personnel, LLC], Northrop Grumman [Technical Services, Inc.], L-3 [Services, Inc.], GLS [Global Linguistic Solutions, LLC], CACI [Premier Technology, Inc.], and Linc [Government Services, L.L.C.] were rated as Good or

---

9/ The complete SSEB report is at AR 1711-1743.

Acceptable for both the Management and Technical evaluation factors--the two most important criteria – while the proposals of Torres, SAIC, KMS [Solutions], Thomas Wright, and WWLR [WorldWide Language Resources] were found to be Marginal or Unacceptable under one or both the Management and Technical evaluation factors.

(AR 1995.)

The adjectival ratings were graphically depicted.

| Offeror | Overall Assessment (All Factors) | | | | |
|---|---|---|---|---|---|
| | Management | Technical | Past Perf (Risk) | Socio-Economic | Cost ($B) |
| MEP | O | G | | Pass | |
| Northrop Grumman | | | Low | Pass | |
| L-3 | A | A | | Pass | |
| GLS | A | A | Low | Pass | |
| CACI | A | A | Mod | Pass | |
| Linc | A | A | Neutral | Pass | |
| Torres | M | M | Mod | Pass | |
| SAIC | | A | Mod | Pass | |
| KMS | | M | | Pass | |
| Thomas Wright | | M | | Pass | |
| WWLR | | | Mod | Fail | |

The SSA concurred with the SSEB's determination that SAIC's proposal was Unacceptable.

An unacceptable proposal is one that contains major errors, omissions or deficiencies that indicates a lack of understanding of the problems or an approach that cannot be expected to meet requirements and none of these conditions can be corrected without a major rewrite or revision of

the proposal. I agree with the SSEB findings that the various weaknesses (and significant weaknesses) found in the proposals of SAIC, KMS, Thomas Wright, and WWLR are so great in quality and quantity that a complete rewrite would be required to make their proposals acceptable for award. A proposal that is found to be technically unacceptable[10] cannot form the basis of award. Therefore, I find that these proposals are not currently eligible for contract award. (AR 1995-96 (footnote supplied).)

SAIC does not challenge the validity of these awards. *Sci. Applications*, 102 Fed. Cl. at 649. SAIC claims its proposal also qualifies for an IDIQ contract.

For the following reasons it is concluded that SAIC did not establish that the Army's ratings or procurement decisions were irrational or in violation of law, or alternatively that any errors were prejudicial.

**Bid Protest Jurisdiction**

This court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded." 28 U.S.C. § 1491(b)(1). This is a post-award protest.

---

[10] When questioned at oral argument, counsel was unable to offer specific guidance on any difference between "unacceptable" (which is defined in the Solicitation, AR 907, § L.4.3.2) and "technically unacceptable" (which is not), suggesting that "technically unacceptable" may be a term of art. Oral Argument of March 20, 2012 colloquy between the court and Mr. Seth Greene at 2:39:58-40:56 p.m. Oral Argument was recorded using the court's Electronic Digital Recording (EDR) system. The time noted refers to the EDR record of the argument.

The Federal Circuit has explained that "'a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.'" *Allied Tech. Group., Inc. v. United States*, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996)).

**Standard of Review**

Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) governing motions for judgment on the AR, the court's inquiry is whether given all the disputed and undisputed facts in the record, a party has met its burden of proof. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005). The court may make factual findings. *Id.* The resolution of the cross-motions presented here is akin to an expedited trial on the paper record. *Id.*

"[T]he proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057- 58 (Fed. Cir. 2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324,1332-33 (Fed. Cir. 2001)). *See also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).

In *Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, the standards for determining arbitrary or capricious are described:

> Normally, an agency [decision] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

463 U.S. 29, 43 (1983). The Supreme Court also held that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" and the court "may not supply a reasoned basis for the agency's action that the agency itself has not

given." *Id.* at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). "[I]t is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review.' Failure to provide the necessary clarity for judicial review requires the agency action be vacated." *Timken United States Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (citing *Camp v. Pitts*, 411 U.S. 138, 142-43, 36 L. Ed. 2d 106, 93 S. Ct. 1241 (1973)). The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted).

"The arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts*, 216 F.3d at 1058. *De minimis* errors in the procurement process do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)). SAIC bears the burden of establishing a significant procurement error. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

Review is narrow. The court will not disturb ratings assigned by the agency absent a showing that they have no rational basis. *See E.W. Bliss Co.*, 77 F.3d at 449 (noting that "challenges to the procurement [that] deal with the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."). Mere disagreement with agency evaluations "fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003). "The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Overton Park, Inc. v. United States*, 401 U.S. 402, 416 (1971). *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (concluding that "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified

experts even if, as an original matter, a court might find contrary views more persuasive").

Deference to military decisions is heightened further because of the national security interests implicated. 28 U.S.C. § 1491(b)(3) ("In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."). See *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 702 (2010) ("[W]hen military and national security interests are implicated, the public interest factor gains 'inflated' importance in the court's balancing of the equities." (citation omitted)). Accordingly, courts are particularly reluctant to interfere with agency decision about how best to equip and run military operations because such decisions "are essentially professional military judgments." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *North Dakota v. United States*, 495 U.S. 423, 443 (1990) ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle."). As the United States [11/]

Supreme Court has observed, "[j]udges are not given the task of running the Army." *Orloff v. Willoughby,* 345 U.S. 83, 93 (1953).

If "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. That is, even if error were established, SAIC must also prove that the error prejudiced it. This prejudice prong requires the court to again examine standing – this time from a merits rather than a jurisdictional perspective. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *Sci. Applications*, 102 Fed. Cl. at 651-56. SAIC again bears the burden of proof, and must "show that there was a 'substantial chance' [it] would have

---

[11/] SAIC would limit consideration of national security to determinations of the appropriateness of injunctive relief, and as so limited, that concern would not be triggered because including SAIC in the group of awardees would only increase possible sources of linguists which, it is contended, would not hinder, but enhance national security by expanding the universe of potential contract sources. While national security concerns are appropriately, and heavily weighed in determining whether to grant injunctive relief (typically by postponing a procurement for the supply of, for instance, needed materials), as cited precedent establishes, deference to military evaluation in the merits of a protest goes beyond the high discretion afforded technical ratings, to an even higher plane when the decisions implicate national security.

received the contract award but for the [government's] errors in the [procurement] process." *Bannum*, 404 F.3d at 1358 (citing *Info. Tech.*, 316 F.3d at 1319). *See also Sys. Application & Tech. v. United States*, No. 2012-5004, 2012 WL 3631249, at *5 (Fed. Cir. Aug. 24, 2012); *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006).

**Claimed Rating Errors**

The SSEB's ratings of SAIC's 604-page proposal (AR 951-1555), adopted upon review by the SSA, were:[12]

> 1. **Management factor**: <u>Unacceptable</u>
>    - Subfactor 1.1 Management Plan: <u>Unacceptable</u>
>    - Subfactor 1.2 Staffing Plan: <u>Marginal</u>
>    - Subfactor 1.3 Transition Plan: <u>Marginal</u>
>    - Subfactor 1.4 Security Plan: <u>Acceptable</u>
> 2. **Technical factor**: <u>Acceptable</u>
>    - Subfactor 2.1 Technical Understanding and Capability: <u>Acceptable</u>
>    - Subfactor 2.2 Sample Task Order: <u>Marginal</u>
>    - Subfactor 2.3 Quality Control Plan: <u>Marginal</u>
> 3. **Past Performance factor:** Good Performance; Moderate Risk
> 4. **Socioeconomic (Pass/Fail):** Pass
> 5. **Evaluated Cost:** ██████████

(AR 1724-25, 1733-34, 1737-38, 1740-41.)

SAIC's protest addresses primarily the Management and Technical factors and subfactor ratings which will be examined in turn.

---

[12] These rating are summarized in the SSEB's Report (AR 1711-43) and detailed in the Management Evaluation Report (AR 1744-1839), the Technical Evaluation Report (AR 1840-84), the Socio-Economic Evaluation Report (AR 1885-90), the Cost/Price Evaluation Team Report (AR 1891-1957) and the Past Performance Evaluation Team Report (AR 1958-90). In the main, the court will utilize the outline structure used in these reports.

**Management factor**

SAIC received an Unacceptable rating for its Management Plan, the most heavily-weighted factor. (AR 1826-27; 1724.) This Unacceptable rating rendered the entire proposal technically unacceptable and ineligible for an award. Noted deficiencies and consequent ratings were as follows:

    *a.*    *Subfactor 1.1 - Management Plan*: **Unacceptable**.

The SAIC Management Plan contains major errors, omissions, or deficiencies that indicate a lack of understanding of the problems or an approach that cannot be expected to meet requirements and none of these conditions can be corrected without a major rewrite or revision of the proposal. Specifically, SAIC's management approach spreads accountability and responsibility to multiple members of the team, resulting in a flat organizational structure similar [sic], which will likely complicate lines of communication and authority and result in numerous internal staffing process issues requiring deconfliction and diverting senior management attention from actual contract performance. Moreover, the delay in the decision making process and issues caused by SAIC spreading out accountability and responsibility will significantly increase the risk to the Government. In addition, SAIC proposes ▮▮▮▮▮▮▮▮ subcontractors in order to achieve the number of linguists required by the Government. From a management perspective, the management of ▮▮ subcontractors is, by itself, complex and difficult to control; however, the problem is exacerbated, if not untenable, when the subcontractors ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Additionally, SAIC did not identify any process controls for correcting poor subcontractor performance, which is critical with this number of subcontractors. The lack of subcontractor management 'responsibility' in-country significantly increases the risk to the Government. Further, SAIC did not address its approach to controlling and reducing costs.

    i.    <u>Significant Strengths</u>: None

  ii. <u>Strengths:</u> None

  iii. <u>Significant Weaknesses:</u>

(AR 1827-28.)

Several categories of concern were identified which were considered Significant Weaknesses, increasing performance risk.[13]

**1. Accountability and Responsibility**

SAIC's internal disbursal of responsibility and accountability for performance tasks was considered a deficit that increased risk to the government.

> SAIC has spread accountability and responsibility to multiple members of the team. The result is a flat organizational structure similar to University like management approach. For military operations a flat organizational approach complicates lines of communication and authority and will likely result in numerous internal staffing process issues requiring deconfliction and diverting senior management attention from actual contract performance. The delays in decision making and issues caused by the SAIC spreading out accountability and responsibility significantly increases the risk to the Government.

(AR 1827.)

SAIC does not take issue with the Army's discretion to rate an organizational structure that disperses responsibility and accountability as a Significant Weakness, rather SAIC interprets the characterization of its management as a flat organizational structure as implying the Army's preference for a hierarchical[14] model. With that premise, SAIC retorts that its proposal was misread, parts were ignored and the SSEB focused exclusively on one of several organizational depictions, specifically Figure

---

[13] Proposal risks were defined as "risks associated with the likelihood that an offeror's proposed approach will meet the requirements of the solicitation." (AR 1571.)

[14] Hierarchical management generally contains different levels, the higher levels having authority over the lower.

2-5, titled Responsibility, Accountability, Coordination, and Information (RACI Matrix) (AR 1041), overlooking other parts of its proposal, including its statement that: "[t]eam SAIC's management structure is a hierarchical organization" (AR 1038, § 2.2). An organizational chart follows, which according to SAIC, is hierarchical with all ███████████████████████████████████████████████████ ███████████████████████████████████████ (AR 1038, § 2.2.1 and Fig. 2-3).

> In the absence of any consideration by the Army of what SAIC actually proposed as its hierarchical management organization, SAIC is not asking the Court to second guess the Army on a disputable question of management theory. Rather, SAIC is asking the Court to rule that the Army acted irrationally when it entirely failed to consider large swaths of SAIC's management plan that directly address SAIC's proposed hierarchical management structure.

(Pl.'s Resp. MEP Mot. J. AR 5, ECF No. 90.)

> SAIC also points out that the RACI Matrix cited by the SSEB depicted responsibility and accountability at the IDIQ, not the TO level.[15] Elsewhere a hierarchical structure of ███████████████████████████████████████ ████████████ was depicted, which SAIC contends is the antithesis of a flat management structure. (AR 1157.) SAIC also points to its ████████████████████

[15] Although raised in its Complaint, SAIC does not claim that the Agency was acting outside the parameters of the Solicitation in rating its Management proposal based at least in part on its response to STO Charlie. (Compl. ¶¶ 34, 104.) There were different PWSs at the IDIQ and at the TO levels. (AR 747-54; 873-87.) Response to STO Charlie was in a separate volume to be ranked under the Technical factor. SAIC's organizational structure in that volume had a much smaller RACI Matrix (with only ███ SAIC positions) at the TO level depicting eleven Performance Requirements, assigning ███ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████ (AR 1134.)

████████████████████(AR 1039, Fig. 2-4). This chart contains general job descriptions for 14 individuals, starting with the SrPM and repeating that ████

████████████████████████████████████████

Other representations of what SAIC contends should have passed muster include Figures 2-3 and 2-6. (AR 1038, 1042.)

While the term hierarchical was not used by the SSEB, giving credence to SAIC's defense that a hierarchical management structure would eliminate this particular deficiency and rating, following SAIC's cited conclusory statement that its management structure was "hierarchical" is Figure 2-3 (*id.*), depicting organizational lines between the same SAIC management positions as in the cited Figure 2-4 RACI Matrix, in a general ascending order suggestive (according to SAIC) of upward lines of communication and decision-making. And, while Figure 2-4 "[d]efines [r]oles and [r]esponsibilities" of most of these positions ████

████████████████, the narrative qualifies that a Staffing Plan including "complete job descriptions," specifies that responsibility for various contract requirements are divided among several SAIC key personnel. (AR 1040.)

The SSEB's observations were accurate. The cited RACI Matrix, titled "Team SAIC Management uses a RACI Matrix to Establish Accountability"(AR 1041), did not include subcontractors ████

████████████████████████SAIC defined terms used in the RACI Matrix and elsewhere as follows:

████████████████████████

---

[16] Of the twenty performance requirements in the RACI Matrix ████████

████████████████████



(AR 2050.) SAIC also used these terms to define the "Roles and Responsibilities" of its leadership staff. (AR 993-1003.)[17]

Moreover, dispersal of responsibility for performance requirements cited by the SSEB was not limited to the RACI Matrix.

> Team SAIC has carefully crafted job descriptions based on our history of successful program management and on the request for proposal (RFP) requirements. Every position has clearly defined roles, requirements for which they are accountability [sic], and a list of responsibilities. Each PWS requirement and all appropriate Section H requirements have at least **one position that is responsible for its accomplishment**. Each PRS [Performance Requirements Summary] requirement **has one position that is accountable for its success**.

(AR 1004 (emphasis added).)

Elsewhere, although SAIC proposed a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (AR 1035), and while Figure 2-3 of SAIC's proposal (AR 1038) depicts the SrPM at the top of the organization, the more specific performance tasks identified in the RACI Matrix spread accountability among many players. Figure 2-5 also charted shared responsibility. (AR 1041.)

SAIC's reliance on parts of its proposal outside the Management section to support its position that a hierarchical structure was proposed runs afoul of the Solicitation's instruction that "[a]ny information that is included in the wrong volume

---

[17] These definitions, included in SAIC's Agency-level protest, are part of the AR. *See Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 788 n.28 (2009).

will not be considered" (AR 915), and that "[e]ach volume shall be written on a stand-alone basis." (AR 907.) Defendant cites *IBM Corp. v. United States*, 101 Fed. Cl. 746, 758-59 (2011) and *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 787 (2011) ("[I]t is the responsibility of the offeror to prepare its proposal according to the []specifications, and not the obligation of the agency to piece together a nonconforming proposal."(citation omitted).)

As noted, SAIC complains that the RACI Matrix cited by the SSEB (AR 1041) was for an IDIQ contract, AR 1041, Fig. 2-5, and an STO Charlie-specific RACI Matrix in the Technical volume of SAIC's proposal was ignored. (AR 1157.) Even overlooking its placement in other than the Management volume, the STO Charlie Matrix also depicts dispersed responsibilities. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SAIC's plan to spread accountability and responsibility among members of its management team is also depicted in Figure 4-2 of SAIC's IDIQ-level QCP (AR 1145), Figure 3-1 of its Technical Volume - approach to STO Charlie (AR 1134) and Figure 5-2 of its QCP for STO Charlie (AR 1157.)[18]

The assertion that there is a substantive difference between assessment of Management for the IDIQ and the STO Charlie levels thereby rendering the Agency's rating irrational has not been established.[19] Upon analysis, the Agency's observations are accurate. The cited RACI Matrix spreads accountability and responsibility for various performance requirements among SAIC personnel. Because of potentially more government/contractor communications, the Army's concern about having one "go to" person may have been rational for TO's, SAIC states, but not for an IDIQ contract; therefore, the Army's citation to SAIC's RACI Matrix could not provide

---

[18] While not cited by the SSEB, the court notes these other depictions of disbursed responsibility in response to SAIC's claims that the SSEB irrationally cited only the RACI Matrix to the exclusion of contrary representations in the proposal.

[19] No violation of law or regulation is asserted.

support for the Significant Weakness rating, rendering it irrational. However, giving validity to SAIC's observation that the RACI Matrix was limited to management structure vis-a-vis an IDIQ contract, the SSEB's concern and consequent rating of SAIC's internal management was not so limited.

> For military operations a flat organizational approach complicates lines of communication and authority and will likely result in numerous **internal staffing process issues** requiring deconfliction and diverting senior management attention from actual contract performance. The delays in decision making and issues caused by the SAIC spreading out accountability and responsibility significantly increases the risk to the Government.

(AR 1827 (emphasis supplied).)

The legitimacy of the Army's concern about dispersed lines of authority in connection with the awards of IDIQ contracts here has not been shown to be irrational.

SAIC also refers to language in its proposal that"[l]ines of authority begin with the SrPM" who "has overall responsibility for the contract and reports directly to SAIC's ███████████████████████████████████████████ (Pl.'s Mot. J. AR 25, ECF No. 78-2 (citing AR 1040, § 2.2.3), ███████████████████████████████████████████████ (*id.* at 28 (citing AR 1042)). However, the complete description was that ███████████████████████████████████████████ The SSEB's findings are not irrational.

SAIC would require that the SSEB ask for clarification of inconsistent descriptions of its management structure; however, the Solicitation's Executive Summary warned that "[a]wards may be made from the initial offers without discussions. Therefore, initial proposals should contain the offeror's best terms from a management, technical, past performance, small business participation, and cost/price standpoint." (AR 721, ¶ 6.) SAIC was on notice that initial clarity was required.

Isolated passages assertedly not reviewed or considered, supposed misinterpretations refuted or discounted by SAIC in this protest do not trump the rationality of the decisions made based on accurate observations of its proposal. SAIC cites no requirement that the Agency, in addition to making non-arbitrary, rational and supported decisions following relevant procurement law, must ferret out from SAIC's 604-page proposal any morsels which could be interpreted contrary to the spreading of accountability and responsibility otherwise depicted.

SAIC describes the SSEB's perceived preference for one point of responsibility and contact as "completely irrational." (Pl.'s Resp. MEP's Mot. J. AR 10, ECF No. 90.) While SAIC might disagree with the Army about what its Management proposal was, SAIC does not seriously contend that the Army was not operating within its ambit of discretion to find as unacceptable or as a significant weakness a management plan that dispersed accountability/responsibility for numerous performance standards between various personnel or divided oversight responsibility over subcontractors.

As a contract task may involve more than one PWS or PRS the government client may well have to look to several individuals for questions or problems. The SSEB's concern over this approach was not established to be irrational. The Army did not act arbitrarily, capriciously, irrationally or in violation of law in construing SAIC's management plan as "spread[ing] accountability and responsibility [for performance requirements] to multiple members of the team" (AR 1827),which was well within its discretion and within the parameters of the Solicitation for this massive procurement involving national security.

SAIC has not established that the Army's concern over SAIC's internal organization structure, whether at the TO, IDIQ or any other level, is other than a legitimate concern of the Army in the protest dispute here presented and accordingly has not met its burden to establish that the SSEB's ratings or reasoning were irrational.

## 2.   Subcontractor Management

Another Significant Weakness was the perceived shortcoming of having two different SAIC personnel having "joint oversight responsibility of subcontractors"

which the SSEB determined was "untenable for supporting quick reaction military type operations" (AR 1827), and increased risk to the government.

SAIC admits that it proposed ███████████████████ ██████████████████████ (AR 1041, § 2.2.3), but adds that there was no conflicting oversight – the "division of responsibility for the management of subcontractors by the ████████████████ were delineated in paragraph 2.3.2. (Pl.'s Mot. J. AR 8, ECF No. 78-2.) SAIC also contends that the Army's conclusion of shared responsibility is contradicted by Section 2.3 of its Management Plan which proposed that ████████████████████[.20/] (Pl.'s Reply 8, ECF No. 91.) If so, then other statements about "joint" oversight may, at best, be confusing if not inconsistent.

As cited by the SSEB and admitted by SAIC, in its Management Volume in a paragraph delineating lines of authority which over subcontractors, joint oversight of subcontractors is proposed in the narrative. Also as cited by the SSEB, the RACI Matrix, in that section and two lines before the cited narrative, charts these two positions as both "Responsible" for six different performance requirements. (AR 1041, Fig. 2-5.) It was well within the Army's discretion to consider segmented decision-making between ████████████████ an increased risk and a Significant Weakness in SAIC's Management Plan. If other parts of its proposal can be construed to detract from the joint oversight statement, this in no way refutes that shared responsibility between these ███████████ is articulated in SAIC's proposal and graphically depicted in Figure 2-3 (AR 1038) and in narrative – "███████████████████ have joint oversight of subcontractor participation." (AR 1041.)

---

[20/] Section 2.3 is almost five single-spaced pages and SAIC does not in its Reply pinpoint what was assertedly ignored. It is noted, however, that paragraph 2.3.2 states ████████

██████████████████████████████████

███████████████ " (AR 1045.)

### 3.    Task Order Project Manager Authority

Another Significant Weakness was the role of the TOPM in SAIC's proposal. The Army's evaluation stated:

> Per figure 2-5, the TOPM is not 'accountable' for anything and is responsible for only a few aspects of performance. ███████████████████████████████████████████████████████████████████████████████████ This will likely result in significant problems as the TOPM has a much better understanding of requirements on the ground, but will be constrained by the CONUS based staff/PM from doing anything without staff approval. The IDIQ PM and Staff will make business decisions focused on reporting statistics to corporate rather than responding to warfighter needs. The TOPM function is limited to a subcontractor integrator role within the supported theater, without the actual authority to make subcontracting decisions. The inability of the TOPM on the ground to make and effect decisions (without contacting CONUS based staff) and be held accountable presents significant risk to the Government. V.2 - pg 2-7 - para 2.2.3[.]

(AR 1827-28.)

SAIC claims this reasoning is arbitrary and irrational again because it focused only on Figure 2-5 (the RACI Matrix), to the exclusion of other statements in its proposal that the TOPM has broad "in-country" decision-making authority and responsibilities, that the OCONUS staff exists to support the TOPM, and while the TOPMs report to the APM-Ops, they have authority to execute their assigned TO. (AR 1041, § 2.2.3.) SAIC adds that while located in the United States from where they manage TO's, the TOPM would have subordinate support in the foreign country. "Each TOPM ████████████████████████████ to support TO requirements." (AR 1041, § 2.2.3.) The TOPM manages field

operations in country and is supported by onsite staff. (AR 1039, § 2.2.2; 1047 § 2.4.1.1; 1042, Fig. 2-6; 1040, Fig. 2-4.) ████████████████████████
████████████████████████████████████████████████████████
██████████████████ (AR 1047, § 2.4.1.1.)

 SAIC also points to its statement that ████████████████████
████████████████████████████████ (AR   1035.) 
█████████████████ SAIC continues, pointing to its STO Charlie-level RACI Matrix (Figure 5-2). (AR 1157, § 5.2.1.1.) That RACI Matrix charts the TOPM as accountable for ████████████████████████████████████████████
████████████████████████

 The SSEB's characterization of Figure 2-5 of SAIC's Management plan is accurate. The TOPM, while not accountable for any of the performance requirements, was responsible for █████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████ (AR 1041, Fig. 2-5.)

 SAIC's attempt to deflect to narrative that "the TOPM is the frontline leader of the TO team" is likewise a description tempered by the modifier ███████████
████████████████████████████████████████████████████████
████████████████████████

- 29 -

██████   and  ████████████████████████████████
██████ . (AR 1042, Fig. 2-6.)

Under either the IDIQ or the TO RACI Matrix the TOPM does not have independent authority for TO performance; those who had that authority were in the continental United States. Even under the STO Charlie Matrix located in the Technical Volume, Quality Control Plan, the TOPM was accountable for only ██ ████████████ identified PRSs and ████████████ with several other individuals for most tasks. (AR 1157.) Moreover, consideration of other inconsistent or augmenting statements in SAIC's proposal would not render the Agency's concerns and rating irrational. Ultimate authority and responsibility remained with the United States-based staff that could "make business decisions focused on reporting statistics to corporate rather than responding to warfighter needs." (AR 1828.) SAIC has not met its burden of establishing that the SSEB's determination that SAIC did not present a clear management structure with defined lines of authority and points of contact in this regard was irrational.

**4.  Use of ████ for Subcontractors**

The SSEB also expressed concern about SAIC's proposal to garner, place and manage the some 7,000 linguists through its proposed eTools web-based portal, a separate Significant Weakness.

SAIC relies on at least ████████ subcontractors to ████████████ ████████ linguists required. In essence SAIC is providing the over arching integration management of ██ subcontractors to deliver the required services. Salaries, benefits, etc[.] will be determined by the employee's company. Specific processes at the ground level are determined by each of the subcontractors, with SAIC attempting to build a higher level framework process using the SAIC ████████ that the ██ subcontractors can adapt the output of their processes to. While SAIC does have extensive corporate experience in managing numerous IT/hardware type subcontractors, this approach brings in significant complexity, interoperability issues, and management inefficiencies that impact SAIC's ability to rapidly respond to linguist service type requirements. Additionally, privity of contract with the prime limits the Government[']s ability in working with the subcontractors who will

actually be providing the services on the ground. The prime acting as a general manager of a multitude of subcontractors delivering the actual services therefore significantly increases risk to the Government. V.2 - pg 2-12 - para 2.4.1[.]

(AR 1828.)

In this regard Section M.3.3.1.2 informs that offerors "will be evaluated on the proposed approach to provide a fully qualified work force at contract award as well as the offeror's demonstrated ability to recruit, train, and retain sufficient numbers of linguists with required skill sets to support DLITE requirements. Similarly, Section L.4.5.2.1.4 required offerors to "[d]escribe the approach to identifying sufficient quantity of linguists needed and subsequent, recruiting, hiring, screening, and retaining of qualified personnel. **At a minimum, offerors shall describe the necessary skill type and qualification to meet the objectives**.'" (AR 917 (emphasis supplied).)

SAIC points out that the RFP required "near-real time" data be available to the Army covering subcontractor retention, qualifications, deployment and the like. (AR 740, § 2.2.1.) SAIC proposed to require its subcontractors use its ███████ ████████████████████████████████████████████ then currently in use by SAIC employees. (AR 1045, § 2.3.2; AR 1057, §3.1.1.) This would, it is contended, meet the RFP requirements of near-real time data availability and had been used successfully by SAIC in other complex, high value contracts. (AR 1037, Fig. 2.1.). The SSEB's concern about ████████████ compatibility issues finds no record support and was irrational SAIC concludes.

SAIC proposed to rely on ██████████ subcontractors to ████████████ ████████ linguists required . . . and ████ would be determined by each of the subcontractors. (AR 1828.) Accordingly, to meet the "near-real time" requirement of the RFP, the subcontractors would be required to ████████████████████████████████████████ While ████████ ████████████████ may have been used successfully to manage information from technology subcontractors in other environments, use by dispersed non-IT subcontractors embedded throughout the globe posed risks including possible delays, miscommunications, inefficiencies in communicating from the field to SAIC and then from SAIC to the Agency with whom contractual privity rested. (AR 1828 ("[P]rivity

of contract with the prime limits the Government's ability in working with the subcontractors who will actually be providing the services.").) SAIC has not met its burden to establish that the Agency's concerns in this regard were unreasonable nor that the rationale articulated therefore was inadequate.

## 5.    Sufficient Number of Linguists

Another cited deficiency was the SSEB's skepticism about where and how SAIC would be able to get qualified linguist subcontractors.

> SAIC does not provide its approach (besides  to 'identify' sufficient quantity of linguist[s] needed to support DLITE contract. SAIC only discusses in the abstract, its approach to recruiting, hiring, screening, and retaining qualified personnel. V.2 - pg 2-12/13 – para 2.4.1[.]

(AR 1828.)

An "approach" to filling linguist needs was all that was required, SAIC contends, and a process was assertedly provided. In its Staffing Plan, SAIC listed at least ten prior contracts ██████████ and some of those contracts were in hostile zones. (AR 1058-59, Fig. 3-4.) It would also ██████████ ██████████ to anticipate possible upcoming needs. Paragraphs 2.4.2 and 2.4.4 discussed its "process" for gathering large numbers of linguists should the need arise. Paragraph 3.1.2 of its Staffing Plan included more than two pages describing its "process" for provision of linguists. (AR 1059 (stating that recruiting efforts included being



In its Management Plan SAIC also represented it would: (

Requests for Task Order Proposals (RTOPs) 

(Pl.'s Mot. J. AR 22, ECF No. 78-2.)

In paragraph 2.4.3 SAIC represented that linguists

SAIC also stated in its Staffing Plan that it relied on (*Id.* at 23.)

SAIC objects that its prior experience "with its management methodology under hostile fire conditions, including both linguist contracts and non-linguist contracts" was not adequately considered in the Agency's Management factor ratings. (Pl.'s Reply Br. 4, ECF No. 99 (record references omitted). ) [22]

---

[22] AR 1058 cited as describing SAIC's experience in large deployment of linguists into hostile environs, located in the Staffing Plan section of the Management Plan volume of its proposal, touts its experience in

(AR 1058- 59.)

(AR 1037-38 (Figure 2-2).)

Although SAIC complains that the Agency didn't consider its extensive contract experience, the record indicates otherwise. The Past Performance Evaluation Report, concluded that "[b]ased on the relevance and quality of [SAIC's] past performance, the PPET [Past Performance Evaluation Team] concluded that there existed some doubt (i.e. moderate risk ) that SAIC would be able to perform the required DLITE effort successfully. (AR 1974.) The SSEB concurred.

SAIC's proposal identified a total of ten (prime or subcontractor) prior        (continued...)

Regardless, any absence of consideration would not vitiate the discretion and rationality of the Agency's ratings of SAIC's Management plan.

SAIC complains of citation to SAIC's proposal to support Agency ratings, as transforming an APA arbitrary and capricious review into one of substantial evidence which, it is asserted, is not appropriate in this context. That suggestion aside, the court will apply the arbitrary or capricious, lack of rationality or violation of procurement law standard, noting however that the SSEB's references to specific sections of SAIC's lengthy proposal foster ease in review, particularly in assessing claims of lack of rationality.

SAIC has not established that the Army's discretion to downgrade abstract assurances that thousands of qualified linguists could be provided, rather than providing a specific "approach" or way of accomplishing the task as the Solicitation required, was arbitrary, capricious, irrational or in violation of procurement laws.

_____

22/ (...continued)
contracts as relevant to the DLITE requirements. The PPET found 
SAIC's past performance demonstrates large management capability,
Based on the offeror's performance record, the PPET concluded the risk that SAIC would be able to perform the required DLITE effort successfully was **Moderate**.

(AR 1737-38 (emphasis in original).)

SAIC's prior experience was examined, the PPET concluding that "[a]lthough SAIC has experience managing large contracts, it did not demonstrate  In turn, the conclusions of the Past Performance team was incorporated into the SSEB report. (AR 1735-38.)

iv.   Weaknesses:

Referring to SAIC's proposal, at least eight areas of increased performance risk were identified and rated as Weaknesses. (AR 1829-30.)

## 1.   Lack of Linguist Contract Experience

Increased risk to the Army was cited because SAIC's management was untested in "an austere contingency environment with little or no [dependable] local infrastructure." (AR 1829.) SAIC's prior large-scale IT IDIQ experience was "in a stable climate controlled environment with established local infrastructures" (*id.*), as opposed to the harsh war environment of STO Charlie.

> SAIC lacks a proven management plan, which substantially increases risk to the Government. Although SAIC has experience in managing IDIQ contracts valued in excess of ███████████
> ████████████████████████████████████████
> No clear indication of SAIC having ever implemented a management plan involving over 7,600 personnel in an austere contingency environment with little or no local infrastructure to depend upon. The linguist contracts that SAIC does reference are relevant in that they ███████████████████████████████ that they do not indicate an ability to understand the problems associated with a large scale linguist services contract of the DLITE effort. The lack of proven processes in its management plan increases risk to the Government. V.2 - pg 2-2 - para 2.1[.]

(AR 1829.)

SAIC would transform the SSEB's comments of its lack of experience with a contract with 7,600 linguists in Afghanistan or other austere contingency environment into an unstated evaluation criterion. The Solicitation did not require prior contracts involve linguists or work in Afghanistan or other hostile areas. Rather, the Solicitation required listing of experience with contracts "of a similar size, scope, and nature to the DLITE requirements." (AR 921.) "The management plan shall discuss the offerors [sic] ability to manage the magnitude and complexity of work detailed

in the PWS" which included "any corporate experience that relates to the level and complexity of work detailed in the PWS." (AR 917.) In that the Independent Government Cost Estimate (IGCE) for STO Charlie was ████████████, SAIC's experience with large IDIQ contract valued for ███████████████████████ provided the "level and complexity" or "magnitude and complexity" of prior experience required by the Solicitation SAIC contends. █████████████████████████████████████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

It was not irrational for the Agency to look for experience in managing the type of effort addressed in this Solicitation and conclude that although SAIC had experience with large IDIQ contracts in information technology, its experience with linguists was limited in scale which "[did] not indicate an ability to understand the problems associated with a large scale linguist services contract of the DLITE efforts." (AR 1829.) SAIC did not meet its burden of establishing the SSEB's rating of its past experience was irrational.

## 2.    Key Position Unfilled

Another noted weakness was SAIC's plan not to fill the ████████████ position – a position identified in its proposal as a key position ███████████████████ ███████████ [23]

---

[23] While the RFP did not list a ███████████████ as key position, SAIC identified the ████████ ████████████████████████ (AR 1039-41) ████████████████████████ (AR 1829). As a result, SAIC was required, at a minimum, to provide a resume and a phase-in-plan for the ███████████████████.

The resume requirements were robust. The Solicitation required:                (continued...)

- 36 -

████████████████████████████████████████████████████ until
after an initial TO award. Until that time, the functions of that position would be
handled by ████████████. The SSEB considered this vacancy and shared
responsibility (referred to as dual-hatting) to manage linguist services of the type
and scope required here increased the risk to the government and a weakness.

The ████████ was identified by SAIC as ██████████, but
will not be filled until the first task order award. The ████████

---

23/ (...continued)
Key Personnel Resume. The offeror shall submit resumes for key personnel
intended/planned for assignment to this contract as part of the offeror[s]
management proposal. Resumes shall be presented in a format as described below.
The person[s] name shall appear centered at the top of the first page of the resume.
Each resume is limited to two pages. Each resume shall conform to the following
outline:

- Position Title: Proposed job title on the project
- Duration: Planned duration of the assignment
- Allocation: Percentage of time to be committed
- Current Assignment: Position presently occupied, to include title and organization
  and employer
- Availability: Relationship to the offeror (full/part-time, prime contractor
  employee/subcontractor employee) and a Letter of Commitment shall be provided
  for all key personnel
- Education: Degree, school, majors, minors, and year graduated
- Relevant Qualifications and Specialties: A brief summary of training and
  qualifications[]
- Employment History and Experience: A list showing the programs on which the
  individual has worked, showing the highest position held on each program and the
  duration, including the starting and ending dates, of assignment to each program
- Achievements: Information on honors, awards, publications, and professional
  organizations
- Security Clearance: Current security clearance status, date of most recent Single
  Scope Background Investigation (SSBI), and the adjudicating agency
- Disclosure Statement: Each resume shall contain the following statement and
  signature: "I consent to the disclosure of my resume (or other personal data) for
  evaluation purposes regarding the proposal of the DLITE contract by the
  Department of the Army and INSCOM."

(AR 918-19.)

Contingency resumes and a commitment letter of those not currently employed were
necessary. (AR 919, § L.4.5.2.2.2.3.)

role is to coordinate ███████████████████████
███████████████████ No individual identified or resume provided to support
that key position. SAIC states that the ████████ will perform the
███████ functions until task order award. The amount of work
needed to prepare for a task order of the size and scope of STO-Charlie
requires the IDIQ key personnel to be in-place. Dual hatting the ████
███ increases the risk to SAIC's ability to adequately meet the first
task order requirement, thus reducing the likelihood of ever having a
first task order awarded. If a first task order was somehow awarded to
SAIC, the risk to SAIC meeting the Government timeline objectives
for fill would increase as the ████████ would have to transition in the
new █████████ person. V.2- pg 2-5 - para 2.2.1 (figure 2-3) and para
2.2.2 (figure 2-4)[.]

(AR 1829.)

   SAIC points out that until an award of a TO, █████████who had an
"exceptionally relevant resume" (Pl.'s Mot. J. AR 28, ECF N. 78-2), would be
responsible for those administrative duties. Until it was awarded a TO SAIC asserts
that it would be irrational and inefficient to have a highly qualified place-holder.
Upon award of a TO and until hiring of an ████████,████████████
██████████████████████████████████████████████ would and
could fill that gap.

   The SSEB's observations were accurate. SAIC's proposal stated that "until
the first TO award, or until required, ██████████ also performs the duties of the
████████." Also, Figure 2-4 lists ████████████ as both the ████████ and
████████ and "[w]e will fill the ████████ position at initial TO award." (AR
1039.) And, the ████████ was ████████████ in SAIC's management structure
as proposed. ██████████████████████████████████████████████
████████(AR 1038, Fig. 2-3 (depicting █████████████
██████████████████████████████████████████████
███████████████████████ Duties of the ████████ in addition to
performance and administration of the TO, included:





(AR 995 (omissions not shown).)

Any TO award would require rapid and aggressive implementation of up to thousands of linguists to be deployed worldwide under extreme circumstances. No candidate is suggested; no resume was submitted as required by the RFP. Recruitment and hiring would take time and then that person would have to become familiar with the SAIC's corporate structure and the TO and immediately be responsible for coordinating, "staffing, security, contracts, subcontracts, finance, logistics and administration" (AR 995) among many subcontractors just brought on board due to the TO award. It was not irrational for the SSEB to be concerned about the identity and qualifications of this key person. That concern does not become irrational by SAIC's claim that these functions would be covered by the ███ ███████████████ until any grant of a TO. ████████████████████████ ████████████████████████ (AR 1080 ████████████████████████████ In these circumstances, the Agency's concern about additional IDIQ workload duties of the ████████ and consequent evaluative rating was not established as irrational.

---

24/ The RFP required proposed percentage allocation of time of Key Personnel. (AR 918.)

### 3.   Customer Feedback

The SSEB observed that the on-site forces who need and use interpreters cannot evaluate the quality of interpretative services provided to them which is what was proposed by SAIC. SAIC's proposal was downgraded accordingly.

> SAIC states that ███████████████████████████
> ███████████████ While customer feedback is important from a
> general performance perspective, the customer cannot evaluate the
> 'quality' of translation and/or interpretation the linguist is providing as
> a service. V.2 pg 2-14 para 2.4.1.1[.]

(AR 1829.)

SAIC contends this weakness rating was irrational for two reasons. First, it contradicts the Solicitation's statement that customer feedback was "'the most important external indicator' of quality of all services provided," (Pl.'s Mot. J. AR 23, ECF No. 78-2) and was inconsistent with the SSEB's assessment of a Weakness in SAIC's Technical plan for a purported failure to indicate a process for conducting customer assessments to identify under-performing linguists discussed *infra*.

In addition to disparaging its proposed use of feedback from the customer in the field, SAIC contends the SSEB arbitrarily ignored or disregarded several other components of SAIC's "multi-faceted process" that "banded together" would identify quality of linguist services. (Pl.'s Mot. J. AR 30, ECF No. 78-2.)

The SSEB did not denigrate customer feedback per se. Rather the weakness rating was because in its opinion SAIC put too much emphasis on customer feedback to assess the quality of interpreters' services. The military customer with language proficiency issues would not be able to assess the accuracy or quality of translator services provided. In order to assess quality of translation, language proficiency would be required and if the recipient of the services was fluent in the language then a linguist would not have been necessary in the first place. Furthermore, SAIC's citation to preference in the Solicitation for customer feedback was in Section J.1.7, the Quality Assurance Surveillance Plan (AR 825) which was primarily focused on assessment of requirements other than translation such as recruiting, security,

invoicing, ability to stay within negotiation costs, timely payment and the like. SAIC has not established that it was irrational for the SSEB to assess a risk and confer a weakness rating for proposing that the quality of linguist services be determined by the customer.

### 4.    Lack of Process to Monitor/Mitigate Subcontractor Costs

The Solicitation required a description of "the plans, processes and procedures for controlling and reducing costs." (AR 918, § L.4.5.2.1.7.)

Both the absence of a process for monitoring the costs of the ███████ linguist subcontractors and the lack of any cost saving initiatives resulted in a Weakness rating.

> Under the Cost Control header, SAIC did not address cost control processes for subcontractor efforts. As SAIC is relying upon █ ██████████████████████████████, it is important that SAIC have proven processes in-place to monitor subcontractor costs. Additionally SAIC did not address any cost reduction/saving initiatives. V.2 - pg 2-18 - para 2.7[.]

(AR 1829.)

SAIC suggests its proposal did address cost control by holding its subcontractors to the same regiment it requires of its employees, starting with budgeting, then monitoring and making necessary cost adjustments. (Pl.'s Mot. J. AR 31, ECF No. 78-2.) SAIC assigned control of subcontractor costs to its ████████████████████████████████████████████████████████. (*Id.* at 31-32.) SAIC also represented that its control mechanisms would be incorporated into subcontracts along with performance standards, lines of responsibility, cost controls, and appropriate DLITE contract clauses. (AR 1046.)

The SSEB's observations were accurate. SAIC's Management Volume, Section 2.7 "Cost Control" did not describe a process for subcontractor cost controls. While Paragraph 2.3.3 mentions that subcontracts would include "cost controls," no detail is given. (AR 1046, 1052.) Statements that costs will be monitored and

problems fixed in an undefined way is not a "plan, process and procedure[]" for controlling or reducing costs. Parroting of contract requirements – flow-down of prime contract clauses of promise of cost control, reference to use of its █████, and the like – does not supply the mechanism specificity required. *Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 785-89 (2009) (reiterating RFP requirements without detailing how those requirements would be met did not comply with the material technical requirements of the Solicitation). The Weakness rating was not established to be irrational.

### 5.    Insufficient Number of Linguists and Inherent Time Delays

Upon award of a TO, SAIC proposed to provide linguists from "████████████████████████████;" candidates would be solicited through █████████████████ and other measures – which the SSEB referred to a ████████████. ██████████████ inherently takes time which concerned the SSEB, resulting in another Weakness rating.



In its management structure, SAIC proposes to provide linguists by █████████ INSCOM TO requirements among █████████████. V.2, para. 2, pg 2-2. Specifically: 'When [Request for Task Orders] arrive, vacancies occur, or [quick reaction capability] requirements arise, SAIC posts the requirements ████████████ V.2, para. 2.3, pg 2-8. While this may result in a lower per linguist cost to Government through this ███████████ **it builds in inherent time delays in meeting Government needs**. V.2 - para 2.2 - pg 2-3[.]

(AR 1830 (emphasis supplied).)

SAIC contends this rating was arbitrary because the response to needs for subcontractors or linguists would be at close to real time through ███████████ ███████. (Pl.'s Mot. J. AR 32, ECF No. 78-2.) Also, as the Solicitation required competition of subcontracting opportunities, and while elsewhere the SSEB criticized SAIC's proposal for lack of control of subcontractor cost, here the SSEB inconsistently admitted that the ████████ contemplated would help reduce cost but might take too long – a dichotomy deemed to be irrational.

Rapid garnering and deployment of linguists was essential to successful performance. The Solicitation required the Management Volume include the offeror's "ability and approach to rapidly and adequately respond to relevant, rapidly evolving mission requirements" and "no-notice/short-notice deployment requirements." (AR 917.) The SSEB's opinion was that this ████████████████ for each linguist would take time and time was a risk to the government. Although █████████████████ "may result in a lower per linguist cost, it builds in inherent time delays in meeting Government needs." (AR 1830.) SAIC did not establish that the SSEB's determination that an approach that may save costs but also cause delay was a shortcoming warranting a Weakness rating was irrational.

### 6.   No Management or Organizational Structure for Subcontractors

This Weakness rating was prompted because of lack of sufficient information about the management or organizational structure of the ████████ subcontractors comprising SAIC's team, making evaluation of those structures as required by the Solicitation difficult.

> SAIC lists ███ subcontractors making up their 'team SAIC', however, they do not provide adequate information to evaluate the management/organizational structure of any of the proposed subcontractors. V.2 - pg 2-9 to 2-11 - figure 2-7[.]

(AR 1830.)

SAIC did not specifically claim this Weakness rating was irrational.

7.    **Lack of Mechanism or Process for Ensuring Subcontractor Performance**

The SSEB found SAIC's proposal lacked a process, lines of communication or method for monitoring/correcting/disciplining subcontractor performance or billing/pricing issues which resulted in another Weakness rating.

> SAIC does not explain how its control mechanism which is incorporated into subcontracts, ensures performance within the framework of contract objectives (i.e. provide resolution with potential problems with inadequate or nonperformance of [] accepted performance standards, lines of responsibility, cost controls). Nor does SAIC discuss ways to mitigate or resolve inadequate or non-performance. V.2 - pg 2-9 to 2-11 - figure 2-7[.]

(AR 1830.)

SAIC contends that its proposal contained numerous processes and mechanisms for cost control and attainment of performance objectives, including for its subcontractors.



In these meetings with subcontractors,



Additionally, subcontractors had to comply with SAIC requirements and processes, including DLITE contract provisions.

(Pl.'s Mot. J. AR 26-27, ECF No. 78-2 (several record citations and quotation marks omitted).)

Statements that SAIC proposed ████████████████████████ ████████████████████ corrective matters does not detail how inadequate subcontractor performance would be mitigated or corrected, what corrective measures would be available and under what situations such measures would be taken. It has not been established that the SSEB's determination that the lack of any plans, process or procedure to govern subcontractor deficiencies posed a risk to the government and a Weakness rating was other than reasonable.

### 8.   Approach to Corrective Action

The SSEB also rated as a Weakness the lack of a risk-minimize plan to address any substandard performance in the physical deployment of linguists.

In addressing the management of deployment of linguists to OCONUS locations, SAIC merely states that the company takes prompt corrective measures, but does not provide an approach to these corrective measures

nor a plan to address substandard performance that risks not meeting quality, schedule, or cost requirements. V-2 -pg 2-13 - para 2.4.1.1[.]

(AR 1830.)



SAIC's proposal in the cited section provides that ████████ ████████████████████████████████████ SAIC's Figure 2-8 titled Management, Data and Performance Measures, did not include any plan or process for remedying deficiencies in deployment. (*Id.*) Narrative text provides that ████████████████████████████████████████████████ The foregoing does not however describe how SAIC would intervene to correct flaws or inefficiencies in the deployment of large numbers of linguists or how corrective action would be accomplished. Again, blanket assertions that substandard performance would be reported and remediated with timely corrective action without detail, standards, process or procedure is not sufficient. *Red River*, 87 Fed. Cl. at 785-89. Neither irrationality in rating nor reasoning has been established.

### 9.    Unsupported Backfill

Lack of a plan to fill linguist vacancies was another cited Weakness.



SAIC indicates that '[w]e source our backfills either from ████ ██████████ ' but does not discuss where these linguists are housed (i.e., database, subcontractors, etc.), the accessibility or the reliability of these assets. V.2 - pg 2-15 - para 2.4.3[.]

(AR 1830.)

Contending these observations were irrational, SAIC cites to provisions of its proposal of "estimat[ing] required languages, capabilities, and quantities to plan

- 46 -

staffing. . . [and if] the requirement is eminent, we begin identifying and backfilling linguists from across our team," (Pl.'s Statement Facts 40, ECF No. 78-1 (citing AR 1046, § 2.4.1)), and "[w]e source our backfills ███████████████████ ██████. Rapid backfill minimizes the impact to ongoing mission requirements." (*Id.* (citing AR 1049, § 2.4.3.).)

Concern over these conclusory statements that backfills will be made and corrections will be taken, without any specifics as to how, was not irrational.

     v.   <u>Deficiencies</u>: None[25] (AR 1830.)

    *b.*   *Subfactor 1.2 - Staffing Plan*: **Marginal**. (AR 1831.)

The Staffing Plan subfactor was evaluated on the "proposed approach to provide a fully qualified work force at contract award as well as the offeror's demonstrated ability to recruit, train, and retain sufficient number of linguists." (AR 949.) Evaluation factors included "completeness regarding the technical qualifications, knowledge and skills of proposed personnel and how well they correlated to the linguist capability requirements." (*Id.*)

       The SAIC Staffing Plan satisfies the Government's requirements with minimum detail to indicate feasibilty of approach and shows a minimal understanding of the problems with an overall moderate to high degree of risk in meeting the Government's [sic]. SAIC Linguist Lifecycle model approach, which relied on ██ different subcontractor processes being ██████████████████ to manage the DLITE program, poses significant risk with coordinating all the

---

[25] In its Complaint, SAIC contends that because the SSEB concluded that its Management plan had no Deficiency ratings (weaknesses that posed either an unacceptable risk of unsuccessful contract performance or constituted material failures to meet the Army's DLITE requirements), it was irrational, arbitrary, capricious and unreasonable to rate its Management plan as "Unacceptable," an inconsistency warranting relief under 5 U.S.C. § 706(2)(A). (Compl. 21, ¶ 82, ECF No. 1-2.) To the extent that "Deficiency" in this context does not materially differ from "Technically Unacceptable,"defined as major errors, omissions or deficiencies so great in quality and quantity that only a major rewrite would elevate the proposal to acceptable status, that no Deficiency ratings were given does not vitiate the specific finding of "Technically Unacceptable."

recruiting, screening, hiring, deploying, and management support necessary between all the subcontractors systems to meet Government objectives within PWS timelines. This level ███████ for a services type contract of this complexity is seen as adding significant risk to the government. Moreover, SAIC's Chart of Proposed Labor mix and Hours for IDIQ and Task Order indicates a lack of understanding of the requirement. Proposed staffing levels appear ███████ to manage a contract and task order of this size and complexity.

(AR 1831-32.)

      i.     <u>Significant Strengths:</u> None

      ii.    <u>Strengths:</u> None

     iii.   <u>Significant Weaknesses</u>

Several categories of Significant Weaknesses were identified. (AR 1831.)

**1.    Computerized Management of Subcontractors**

The SSEB's concern about SAIC's management of ███████ subcontractors through its ███████████, addressed above, was also considered a Significant Weakness in this subfactor.

SAIC Linguist Lifecycle model (as shown in figure 1.1 of Management Plan) relies on █ different subcontractor processes being ███████ ████████ to manage the entire DLITE program, including all task orders. There is significant risk associated with coordinating all the recruiting, screening, hiring, deploying, and management support necessary between all the subcontractors systems to meet Government objectives within PWS timelines. This level █ ███████ for a services type contract of this complexity adds significant risk to the government. V.2 - pg 3-4 - para 3.1.1[.]

(AR 1831.)

## 2.   Lack of Established ███████

SAIC mentions an ████



███████ SAIC's ability to ████ to reach a fill qualification standard can be impacted by many factors████ ████████████ SAIC does not factor in risks and anticipate mitigation of those risks. Nor does SAIC explain what their established ██████ entails. V.2 - pg 3-6 - para 3.1.2[.]

(*Id.*)

Alleged inconsistencies in numbers of linguists available either immediately or on short notice was also listed previously and the respective positions and arguments of the parties as well as the court's conclusions are not repeated here.

## 3.   Proposed Labor and Hours

The Solicitation required a "chart of proposed labor mix and hours [the offeror] intends to employ." (AR 918, § L.4.5.2.2.1.) Referencing that Solicitation requirement, SAIC's proposal included the following chart titled "Team SAIC's Proposed Labor Mix and Hours, by Key Position and Staffing Functions:"



(AR 1063.)

The SSEB concluded these numbers were too low and reflected a fundamental lack of understanding of the magnitude of effort required – a risk to the government – a deficit rated as another Significant Weakness in the Staffing Plan subfactor.



SAIC only provides labor mix and hours for ████████████ levels, but does not address other personnel to include ████████ required fulfilling [sic] the DLITE contract. SAIC's Chart of Proposed Labor Mix and Hours for IDIQ and Task Order indicates a lack of understanding of the requirement. Proposed staffing levels are insufficient to manage a contract and task order of this size and complexity, especially given ████████████████. Additionally, no ████████ mix and hours [sic] identified or included. The lack of understanding of the labor mix and hours needed for a task order of STO Charlie magnitude adds risk to the Government. V.2 - pg 3-10 - para 3.1.5 (Figure 3-7)[.]

(AR 1831-32.)

SAIC responds that its proposed ████████ labor mix and hours were based on ████████. (AR 1063, § 3.1.5 ("Team SAIC, ████████████, has formulated the right labor mix and hours that will be necessary for each ████ position at the IDIQ and TO levels.").) Because the SSEB failed to explain why the numbers were inadequate, its conclusion that they were, was irrational SAIC reasons. (Pl.'s Mot. J. AR 17, ECF No. 78-2 (citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'").).)

Moreover, SAIC contends that since the Solicitation included the number of linguists that could be called and warned offerors not to simply repeat requirements, it made no sense and was unnecessary to parrot that data in the Staffing Plan. (Pl.'s Mot. J. AR 17-18, ECF No. 78-2.) And, it would have been more appropriate to include that information in the Cost Volume of the proposal, which is where SAIC included details on the proposed ratio of management, linguists and support personnel.

Again, mere disagreement with Agency reasoning is an insufficient basis to sustain a protest. Secondly, the Solicitation was clear that the requirements of each Volume must stand alone. (AR 915). The Staffing Plan required not just ███ personnel, but "a chart of proposed labor mix and hours it intends to employ." (AR 918).

It was not established that the SSEB's concern about the absence of ███ position and hours was irrational. SAIC has not established that the Agency's concern about the failure to include ███ position and hours and the staffing level demonstrated a fundamental misunderstanding of the magnitude of the effort required, and a risk to the government, was other than reasonable. Despite SAIC's opinion that staffing hours were part of STO Charlie requisites, the Solicitation mandated that: "[t]he staffing plan **shall** include a chart of proposed labor mix and hours it intends to employ. (AR 918 (emphasis supplied).) Similarly while SAIC posits that this labor hour mix was more appropriately addressed in the Cost/Price volume, the Agency was not required to scour other volumes for relevant material. *Vanguard Recovery Assistance v. United States,* 101 Fed. Cl. 765, 786-87 (2011) (explaining that evaluators "'are not obligated to go to unrelated sections of the proposal in search of needed information which the offeror has omitted or failed adequately to present'") (quoting *Savantage Fin. Servs., Inc.*, B-299798, 2007 CPD ¶ 214, at 9, 2007 WL 4326742, at *6 (Comp. Gen. Aug. 22, 2007)).

iv. <u>Weaknesses:</u> (AR 1832.)

Several deficit areas were identified and rated as Weaknesses.

**1.    Key Position Unfilled**

Repeated here in the Staffing Plan is the SSEB's concern that SAIC's ███ ███ position would not be filled until a TO award and no resume of the person who would be filling this key position was, or could be, provided as required by the Solicitation. Given the importance of this position in getting interpreters to foreign arenas, the SSEB felt this void presented an increased risk to the government that warranted a Weakness rating in the Staffing Plan subfactor.

SAIC states that 'Team SAIC's objective is to have a ███ ███ ready to support the INSCOM mission by the end of

- 51 -

the transition'. SAIC's approach to providing a qualified work force **at contract award**, per the RFP, is missing a key position until after the first task order is awarded. SAIC states the ████████████

████████████████████████████████████████████
████████████████████████████████████████████
████
And SAIC's [sic] states ████████████████████
████████████████████████ Yet, SAIC has not identified an individual or provided a resume to support that key position. This presents an increased risk to the Government. V.2 - pg 3-4 – para 3.1.1.1[.]

(AR 1832 (emphasis in original).)

Again, the SSEB's observations were accurate. (AR 1038-40.) SAIC's ████████ ████████ would act as both ████████ and ████████████ until first TO award. The previous discussion on this dual-hatting Weakness and the court's findings are incorporated but not repeated.

## 2.    Training ████████████████

The SSEB also again questioned SAIC's ████████████████ training and lack of a process to address qualification failures.

SAIC's training program is ████████████. The effectiveness of this type of training is questionable. While the training process identified in figure 3-8 is acceptable for first time pass employees, there was no process identified for when someone does not qualify. V.2 - pg 3-10/11 - para 3.2.1/3.2.2[.]

(*Id.*)

SAIC reasons that it was not rational for the SSEB to consider ████████ training acceptable if a candidate passed, but not acceptable if the candidate did not pass simply because no process was proposed to follow-up on that failure. Also, SAIC points out that on-site language and cultural training was offered through its ████████████████████████████ including retraining of those who did not pass. The failure to consider or even mention this Plan training was assertedly not rational.

(Pl.'s Mot. J. AR 35, ECF No. 78-2 (citing *State Farm*, 463 U.S. 29, 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'").)

The SSEB was not just concerned about the ███ nature of the training, but the lack of a remedial process for those who do not qualify, pointing out that Figure 3-8 proposed on-site (presumably in the field) retraining and periodic refresher courses but nothing other than ███ retraining.

SAIC also refers to section 3.2.1 of its Staffing Plan referring to its SAIC University which offers "various ███ training courses in ████████████████████████████" (AR 1063), and to on-site training provided by outside vendors. Even if this brief reference to in-country training could be sufficient to elevate this Weakness rating, the standard is not whether there is substantial evidence to support the rating that SAIC would have liked. Rather, the standard is whether, given the high level of deference due these technical ratings, SAIC has established they lacked rationality, and that threshold has not been crossed.

v. <u>Deficiencies:</u> None (AR 1832.)

c.    *Subfactor 1.3 - Transition Plan*: **Marginal**. (*Id.*)

Generally, in this context transition referred to the change from an incumbent contractor. Factors to be evaluated included the "soundness of the offeror's approach for a seamless transition between contracts and task orders and its proposed approach and execution to the transfer of tasks between contractors." (AR 949.) The proposal should demonstrate the "offerors' understanding of the Army and the agency's operational environment and the thoroughness of its approach." (*Id.*) SAIC's Transition Plan was rated Marginal.

The SAIC Transition Plan satisfies the Government's requirements with minimum detail to indicate feasibility of approach and shows a minimal understanding of the problems with an overall moderate to high degree of risk in meeting the Government's [sic]. SAIC's transition approach demonstrates a lack of understanding of the

Army's and INSCOM's operational environment, and lacks capability in attaining the performance objectives. Specifically, the lack of consistent numbers of linguists available combined with the inadequate lack of risk identification, assessment, and mitigation strategy only increases Government risk.

(AR 1832.)

     i.    Significant Strengths: None

    ii.    Strengths: None

   iii.. Significant Weaknesses: (AR 1832.)

Several categories of Significant Weaknesses were identified.

**1.    Inconsistent Numbers of Linguists Required and Limited Analysis of Transition Risks**

It bears repeating that for STO Charlie, offerors were to demonstrate their ability to deploy up to 7,600 linguists throughout the globe within ninety days of the issuance of a TO. (AR 884 ("Sample Technical Exhibit for Sample Task Order Charlie" indicating total immediate requirements of 7,597 linguists), 881(PRS item 1 requiring fill within ninety days).)

The SSEB again cited inconsistent numbers in SAIC's proposal, limited acknowledgment of possible risks in transitional contingency planning, questionable approach to mitigation of those risks and lack of confidence in SAIC's unsupported declaration that it had a ██████ ██ linguists that could be deployed within 90 days, all of which significantly increased risk to the government.

Figure 4-8 indicates only ████ candidates in the pipeline to support STO Charlie, the original access to ████ linguist in Management Plan that was downgraded to a ███ linguist ████ in the Staffing Plan, and now the Transition Plan states only ███ linguist are in pipeline. Additionally, only 4 risks to transition were identified with very questionable mitigation strategies planned. The lack of consistent

numbers of linguists available combined with the inadequate risk identification, assessment, and mitigation strategy significantly increases risk to the Government. V.2 - pg 4-10 - para 4.4 (figure 4-8)[.]

(AR 1832-33.)

SAIC argues there was not a candidate pipeline inconsistency. (Pl.'s Mot. J. AR 29, ECF No. 78-2.) Different numbers represented different categories of interpreters.  Also SSEB's wholesale discount of the four transition risks SAIC acknowledged in its proposal without rationale was assertedly irrational. (*Id.* at 30.)

Inconsistencies cited were accurate. SAIC's proposal in one place represented more than ███ resumes were in the pipeline (AR 1098, Transition Plan, Fig. 4-8); in another place SAIC represented that it "brings" ██ subcontractors and more than ███ linguists (AR 1045, Management Volume Overview); and elsewhere, SAIC represented it had "an ████████ of more than ███ language processionals that continues to grow, which, along with incumbent capture, ensures we will reach a filled qualification standard within the TO specified transition period or within 90 days if no period is specified" (AR 1059, Management Plan, Subfactor 1.2 – Staffing Plan.) All of these representations were in the Management Volume of its proposal. The SSEB's observation of these differences was not established to be unreasonable. Varying numbers were of concern to the Agency precluding confidence in SAIC's ability to fully and timely respond, which was perceived to increase risk to the government. This evaluation and consequent rating was not established as unreasonable.

The SSEB's observation that SAIC identified only four possible risks26/ in a transition was also correct (AR 1098), and skepticism of that limitation and the

_____

26/ Potential transition risk categories were: (1) " ████████████████████████

████████████████████████████████████████████████████

████████ " (AR 1098.)

mitigation proposed were well within the Army's technical evaluative discretion that "[t]he lack of consistent numbers of linguists available combined with the inadequate risk identification, assessment and mitigation strategy significantly increases risk to the Government." (AR 1833.)

## 2.   No Subcontracts in Place

SAIC's heavy reliance on subcontractors without any subcontractor commitments was concluded to "[s]ignificantly increases the risk of successful transition."

> SAIC places high dependency on its 'selected' subcontractor team and its capabilities, but does not discuss any agreement/commitment from these subcontractors that they will join SAIC if SAIC is awarded the DLITE contract which significantly increases risk of successful transition. SAIC does not identify this as a potential transition risk and therefore does not provide mitigation for this risk V.2 - pg 4-4 – para 4.1.2[.]

(AR 1833.)

SAIC counters by referencing the same page of its proposal cited by the SSEB for lack of subcontractor commitment that "Team SAIC was 'committed' to the DLITE Program at the highest organization level" and "this includes the full corporate support of SAIC and its ▮ subcontractors.'" (Pl.'s Mot. J. AR 31, ECF No. 78-2 referencing AR 1093, § 4.1.4.) SAIC points out that although the Solicitation did not require teaming agreements, in the Socio-Economic volume of its proposal SAIC represented that it had exclusive teaming agreements with ▮▮▮▮ subcontractors. (*Id.* (referencing AR 1240, § 2.1 ("'We have exclusive teaming agreements with all ▮▮▮▮ of our teammates, of which ▮▮ ▮▮ small businesses.'").) SAIC cites its careful selection of subcontractor "teams" which included ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (AR 1092.)

Nevertheless, the concerns expressed by the SSEB find root in the Solicitation, which required offerors to detail "methodologies used for ensuring seamless transition between contracts and task orders." (AR 919.) Conclusory statements of commitments are not methodologies. *See Red River Holdings*, 87 Fed. Cl. at 787 ("[B]lanket statements that an offeror will meet or exceed [requirements] have been found to be noncompliant.") (citing *Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 49 n.9 (2005)).

SAIC's Transition Plan concerning subcontractors did not include either commitments, teaming arrangements or other details as to how the transition to hiring all these specialized subcontractors would be accomplished in a short time frame.[27] SAIC's representation in the Socio-Economic Volume of its proposal that exclusive teaming agreements were in place could not have satisfied this requisite because each volume was to be considered discretely for the section designated. "Information required for proposal evaluation not found in its designated volume or presentation will be assumed to have been omitted from the proposal." (AR 907-08.) SAIC's arrangements with its subcontractors is a relevant and reasonable consideration and the Agency's concern over the lack of subcontractor commitments or other contingency plans was viewed as an increased risk to the government and a Significant Weakness and has not been established to be irrational.

        iv.   <u>Weaknesses:</u> (AR 1833.)

Several Weakness ratings were given.

---

[27] Section 4.1.2 of SAIC's Transition Plan provided in relevant part:



(AR 1092.)

### 1.    Task Order Project Manager Dual-hatted

Again, as SAIC relied heavily on subcontractors but had no commitments, the "transition" to performance of a TO would be a challenge in itself. Assignment of the that subcontracting function to the dual-hatted TOPM "increases the risk to project success" (AR 1833), repeating the previous perceived weakness, this time from a Transition perspective.

> SAIC TOPM is "dual hatted" as Transition Manager. SAIC states that 'all' TO transition activities are led by the TOPM, which increases risk to project success. V.2 – pg 4-3 – para 4.1[.]

(*Id.*)

SAIC disagrees, and insists that with support from the rest of the team, the TOPM/Transition Manager could handle it. SAIC adds that the SSEB ignored discussion on the same page of "the substantial support provided the TOPM in transitioning task orders, and explained the substantial benefits of having the TOPM dual hatted as the dedicated Transition Manager." Further support for the TOPM was detailed in SAIC's Transition Plan and Management Plan. Failure to mention this support or give reasons for its conclusion that these additional duties would increase risk to the government was assertedly irrational under *State Farm*. (Pl.'s Mot. J. AR 32, ECF No. 78-2.)

The SSEB's observations were accurate.



> All TO transition activities are led by our TO Project Manager (TOPM) ▮▮▮▮▮▮▮▮ who serves as the dedicated Transition Manager and oversees the startup operations of all TOs. The TOPM/Transition Manager serves as the main TO interface ▮▮▮▮▮▮▮▮

(AR 1091.)

The inquiry is not who is right or wrong in this hypothetical as it is not the province of this court to second guess the Army's determination of performance risk. Rather, there being no statutory or regulatory violation alleged as to this rating, the analysis is limited to whether the reasoning was rational and consistent with the evaluation criteria. *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 370-71 (2011). The Agency reasonably determined that dual-hatting an individual with responsibility for overseeing task orders and transitions could pose risks to a "seamless transition between contract and task orders" or "transfer of tasks between contractors" – requirements of the Solicitation. (AR 949.) SAIC's disagreement with this evaluation does not render it unreasonable.

> v.   Deficiencies: None. (AR 1833.)

> d.   *Subfactor 1.4 – Security Plan*: **Acceptable**[28]

> The SAIC Security Plan satisfies all of the Government's requirements with minimum detail to indicate feasibility of the approach and shows a minimal understanding of the problems, with an overall moderate degree of risk in meeting the Government's requirements. Specifically, SAIC understands and is committed to meeting the security requirements, but contains no strengths or weaknesses that either enhance or degrade it[s] ability in managing risk in this area.

(AR 1833.)

> i.   Significant Strengths: None

> ii.   Strengths:



> SAIC has an [                    security process.                                                                                                       as required. V.2 - pg 5-2 - para 5[.]

---

[28] The Security Plan was the lowest-weighted Management subfactor. (AR 946-47.)

    iii.   Significant Weaknesses: None

    iv.   Weaknesses: None

    v.   Deficiencies: None

(AR 1833.)

**Technical Factor**

Overall, SAIC received an Acceptable rating for its Technical plan.

The SAIC's Technical Proposal satisfies the government's requirements with minimum detail to indicate feasibility of approach and shows a minimal understanding of the problems with an overall moderate to high degree of risk in meeting the government's requirement.

(AR 1879-80.)

SAIC challenges the Acceptable rating, contending it should be higher. SAIC does not, however, challenge the Acceptable rating given to the following Subfactor 2.1, the technical approach for the IDIQ contract, which is the Technical factor's most important subfactor.

    a.   *Subfactor 2.1 – IDIQ Technical Approach*: **Acceptable**. (AR 1880.)

For Subfactor 2.1 (which constituted 51 percent of the overall Technical factor score (AR 1714-15)), the SSEB evaluated SAIC's proposal as posing a moderate degree of risk to the government.

SAIC's IDIQ Technical Approach satisfies all of the government's requirements with minimum detail to indicate feasibility of the approach and shows a minimal understanding of the problems, with an overall moderate degree of risk in meeting the requirements.

    i.   Significant Strengths: None

      ii.    Strengths: None

      iii.   Significant Weaknesses: None

      iv.  Weaknesses: None

      v.   Deficiencies: None

(AR 1880.)

      b.    *Subfactor 2.2 – STO C Technical Approach*: **Marginal**. (AR 1880.)

The SSEB cited "disconnects" and "discrepancies" between the Management and Technical volumes of SAIC's proposal and conferred a Marginal rating for this subfactor for reasons which overlap, to some degree, critiques of SAIC's Management proposal.

> The SAIC's [STO Charlie][29] Technical Approach satisfies most of the government's requirements with minimum detail to indicate feasibility of approach and shows a minimal understanding of the problems with an overall moderate to high degree of risk in meeting the government's requirements. SAIC's Responsibility, Accountability, Coordination, Information (RACI) management approach is ████████, where responsibility and accountability are spread to ██████ its subcontractors. This ██████████ approach, however, places responsibility with its subcontractors but withholds the authority to modify the prime's contract, which would be needed in order to rapidly adapt to evolving requirements – thus, increasing risk to the forces on the ground to get rapid support.

(*Id.*)

---

[29] To reiterate, STO Charlie included immediate deployment of 5,494 CAT I LN (Local National) linguists; 796 US CAT I (United States) linguists; 1,136 CAT II linguists and 171 CAT III linguists, for a total of 7,597 linguists. (AR 884.) The Solicitation required the Army use responses to STO Charlie to evaluate for cost realism and reasonableness to establish a probable cost for use in trade-off evaluation to determine best value. (AR 950, § M.3.3.5.1.) The Independent Government Cost Estimate for STO Charlie was $4,116,377,742 . (AR 1741.)

SAIC contends that the SSEB gave no reason why the inability of subcontractors to modify SAIC's prime contract increased risk to the government. The SSEB's observation was accurate and the concern expressed was not shown to be irrational. The IDIQ RACI Matrix (Fig. 2-5, AR 1041), assigns subcontractors responsibility for ███████████████████████████. The TO-RACI Matrix plots subcontractors as responsible for ██████████████████████ ██████████. (AR 1157.) Subcontractor responsibility for a significant part of the Performance Requirements but lacking contractual privity with the government may hinder the ability to react rapidly to evolving contract requirements, perceived as an increased risk to the government, concerns not established to be arbitrary or capricious.

    i.    <u>Significant Strengths:</u> None

    ii.    <u>Strengths:</u> None

    **iii.**    <u>Significant Weaknesses:</u> (*Id.*)

## 1. Discrepancies

SAIC Technical Volume states that a 'dedicated' TO manager/transition manager facilitates a seamless transition. The Management volume, however, indicates the transition manager is the TOPM who is "dual hatted" (V.2, pg 2-6, figure 2-4). This seems to make the "dedicated" portion of statement at the bottom of pg 3-1 incorrect, and raises questions about the number of disconnects between the Management and Technical volumes. The discrepancies between proposal volumes indicate an integration problem. V.3 - pg 3-1 - para 3[.]

(AR 1880.)

SAIC denies there were any disconnects. Both the Management and Technical Volumes of its proposal identified the TOPM as TO and transition manager. (Pl.'s Mot. J. AR 33, ECF No. 78-2.)

SAIC's Transition Plan in its Technical Volume provided:

All TO transition activities are led by our TO Project Manager (TOPM) ███████████ who serves as the dedicated Transition Manager and oversees the startup operations of all TOs. The TOPM/Transition Manager serves as the main TO interface



(AR 1091.) SAIC's Management Plan tasks the TOPM, ███████, not only with executing the TO and managing transition, but also ███████ ██████████████████████ (AR 1040, Fig. 2-4.), the additional responsibilities supporting the SSEB's reference to dual-hatting. The significant duties above and beyond TO manager/transition manager support the SSEB's reasoning that the TOPM was not "dedicated" (solely devoted to) TO and transition management as SAIC represented. (AR 1131.)

### 2. TOPM CONUS Location and Minimal Authority

In Figure 3.1, the SAIC proposed RACI Matrix doesn't hold anyone accountable for ████████████████████████████ The TOPM, in OCONUS, is only accountable for maintaining ████████████████████ The risk of delays in getting approvals and decisions are extremely high. The risk of disconnects in SAIC coordinating ████████ subcontractors efficiently and effectively is also extremely high. The risk to the government is of significant concern. V.3 - pg 3-4 -para 3.2.1[.]

(AR 1880-81.)

SAIC repeats the Army's alleged irrational reliance on the IDIQ RACI Matrix. Its STO-Charlie-specific RACI Matrix represented that the TOPM "is responsible for all in-country management and substantive PRS requirements." (Pl.'s Mot. J. AR 34, ECF No. 78-2 (referencing AR 1157, § 5.2.1.1 & Fig. 5.2.).). SAIC also contends the Army ignored narrative representations of broad authority of the TOPM OCONUS.

The RACI Matrix relied upon by the SSEB was accurately represented. SAIC's defense that another RACI Matrix submitted under a different subfactor, refuted the SSEB's concern does not render the cited accurate reasoning irrational. Indeed, any inconsistency would further validate the "disconnects" previously cited.

Moreover, as assertedly ignored by the SSEB, the narratives that SAIC contend establish that the TOPM had broad authority in the foreign field provide that approval from CONUS was required. (AR 1135 (stating that the TOPM "reports to [United States-based] ▮▮▮▮▮▮ for overall TO execution and performance.").) Therefore, even reference to the narrative does not establish the SSEB's reasoning to be irrational.

    iv. <u>Weaknesses</u>

As the Solicitation required, SAIC's Sample Task Order Charlie Technical Approach included its "Proposed Approach to Performing the Work." (AR 1133 (specifically referencing Sections L.4.5.3.2 and M.3.3.2.1 of the Solicitation).) Therein SAIC represented:

> Beyond the stated and technical performance requirements of the PWS, Team SAIC also works



(AR 1133-34.)

The SSEB assessed a Weakness for failure to provide a process or procedure for monitoring translation accuracy.

SAIC states they 

. However, they fail to indicate their process or procedure for doing this. V.3 - pg 3-4, para 3- 2[.]

(AR 1881.)

SAIC contends that "[t]he Army simply disregarded SAIC's technical proposal in which SAIC proposed an extensive treatment of how it monitors linguist performance and ensures performance of all requirements under the RFP's PWS at the IDIQ and task order level." (Pl.'s Mot. J. AR 35, ECF No. 78-2.) Specifically, SAIC proposed

SAIC asserts the Army simply irrationally ignored the processes identified in its proposal for monitoring linguist performance, assessing quality of services provided to the customer and resolving customer complaints.

The monitoring and measuring representations SAIC cites were in a separate part of the proposal, in Subfactor 2.3 Quality Control Plan (AR 1161) some thirty pages from the provisions of concern to, and accurately cited by, the Army. (AR 1134, para 3.2 ("

).) The SSEB did not irrationally evaluate SAIC's conclusory representations that it had processes and procedures for

, nor was its concern that the lack of a process or procedure[30] posed a performance risk to the government arbitrary or capricious. The SSEB also noted that subcontractors were responsible and accountable for many tasks but lacking contractual privity, they could not amend the TO which would be needed for quick reaction time, resulting in a risk to the government. These concerns have not been established to be irrational.

---

[30] Generally, a process or procedure is a series of actions or steps.

iv.    Deficiencies: None

d.    *Subfactor 2.3 QCP*: **Marginal** (AR 1881.)

The RFP instructed offerors to submit a quality control plan "for measuring and attaining quality of performance," and that the plan "will be evaluated on how well it demonstrates a comprehensive, verifiable, and self-implementing approach for monitoring the offeror's performance." (AR 949.) SAIC's QCP was rated Marginal. The evaluation stated:

> SAIC's QCP satisfies the government's requirements with minimum detail to indicate feasibility of approach and shows a minimal understanding of the problems with an overall moderate to high degree of risk in meeting the government's requirement. The SAIC QC approach relies too heavily on ▮▮▮▮▮▮▮. Additionally, the TOPM is only accountable ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The LOC and authority conflict between the RACI Matrixes. The risk to the government of SAIC being capable of effectively integrating ▮▮▮▮ subcontractors is high.

(AR 1881.)

    i.    Significant Strengths: None

    ii.    Strengths: None

    iii.    Significant Weaknesses: None

    iv.    Weaknesses

A weakness was assigned for the Quality Control Plan relying too heavily on unverified and unbiased data ▮▮▮▮▮▮▮▮▮▮▮▮▮.

**1.    Reliance on ▮▮▮▮▮▮**

> The SAIC QC approach relies too heavily on the ████████. The
> data collected and analyzed from ██████████ is only as good as
> the data that is put into it. Proper QA/QC requires some level of
> physical verification and validation of what is actually happening on
> the ground from an unbiased source. While the QC Manager ████
> ████████████████████ if he relies solely on the ████
> ████ to determine if processes are functioning properly, then the risk
> to the government significantly increases. V.3 - pg 4-1 - para 4[.]

(AR 1881-82.)

    SAIC contends that the role of ██████ in quality control was misunderstood;
████ is a ████████████████████████ to facilitate the QC
process, not a substitute for the extensive quality control process detailed by SAIC's
proposal that relies upon observation, inspection, customer feedback and data trend
analysis by the QCMgr. Its QCP plan included a chart of performance areas to be
inspected, frequency involved and identity of inspectors. The ██████ information
████ was to facilitate the exchange, not the gathering, of data.

    SAIC's representation it has a three-part process to ensure quality control did
not describe mechanics, standards or how non-performance would be identified.
████████████████████████████████████████████████Only
the ██████████████would be in theatre and both of those positions have duties
that include both task performance and quality control of that performance. (AR
1160.) Thus the Army's concern of "unbiased" inspections or reviews of on-site
performance data – that is, the ones doing the work also being responsible for the
inspection – was not unreasonable. Also, the concern voiced was not with the use of
██████ per se, but the use ████████ in the circumstances here of transcontinental
communication from those in the theatre to those in the United States charged with
performing quality control work. It has not been established that the Agency's rating
of SAIC's plan to have in-theater managers rate the quality of translation services
performed and submit those assessments through ██████ to SAIC executives in the
United States, was irrational.

    SAIC's reliance on its proposal to "identify performance deficiencies
principally through observation, inspection, or customer feedback" and a chart of
"performance areas to be inspected" (AR 1159-60) does not nullify the Army's

concern nor render its technical evaluation of performance risk irrational. Detail as to when or how physical investigations would be made and how that information would be incorporated into ████████████ was lacking. And the cited chart is only a list of procedural deliverables, with no indication of their contents or relevance, along with a list of personnel assigned to inspect said deliverables. (AR 1160.) The chart identifies ████████████████████████████████████████ ████████████████████████████████████████ again without elaboration. Moreover, a majority of the charted inspectors would be located CONUS █████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████The only OCONUS personnel, and thus the only onsite source of listed information for SAIC's proposed QCP████████████████████████(AR 1160.)

The Army was not unreasonable in being concerned about on-site managers doing their own quality control without "physical verification and validation of what is actually happening on the ground from an unbiased source." (AR 1881.) SAIC has not established that it was irrational, unreasonable, arbitrary, capricious or in violation of procurement law for the SSEB not to have rated SAIC higher than the Marginal rating received.

## 2.    Discrepancies

The SSEB observed that the RACI Matrix submitted as part of its Management Plan conflicted with the quality control plan submitted in the Technical Plan for STO Charlie.



The Matrix depicted in figure 5-2 conflicts with the STO C PWS RACI Matrix on pg 3-4 in figure 3-1. ████████████████████████ ████████████████████████████████████████████ The LOC [lines of communication] and authority conflict between the RACI matrixes. The risk to the government of SAIC being capable of effectively integrating ████████████ subcontractors is high. V.3 - pg 5-4 - para 5.2.1.1[.]

(AR 1882.)

The SSEB's observations were accurate. The authority of the TOPM is different in these two charts. In the RACI Matrix for Performance Requirements in volume 3, the TOPM is ████████████ ███████████████████████ Elsewhere, in the same volume, for the RACI Matrix for Performance Requirements for STO-C, the TOPM is ███████████ ███████████████████████████ SAIC has not established that the Army, responsible for making these technical decisions in the circumstances presented, was other than rational in determining that these discrepancies increased risk to the government.

> v.   Deficiencies: None

SAIC's objections, no matter how strongly voiced, fall short of meeting its heavy burden to establish that the Agency's ratings were irrational, arbitrary, capricious or in violation of procurement law. The Army provided coherent and sound reasoning for its ratings, firmly rooted in SAIC's proposal and the requirements of the Solicitation. SAIC has not established any viable basis on which to change its overall Unacceptable rating such as to elevate it above the break point used to award six IDIQ contracts in this procurement.

**Unequal Evaluation**

SAIC does not contend that the Army compared proposals in contravention of the terms of the RFP precluding such action. Indeed, for this court to employ comparative analysis would counter the principles of *OMV Medical, Inc. v. United States*, 219 F.3d 1337,1343-44 (Fed. Cir. 2000) (stating that agency action must be judged on grounds employed by the agency); *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) ("we may not supply a reasoned basis for the agency's action that the agency itself has not given"); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."); *All Seasons Constr., Inc. v. United States*, 55 Fed. Cl. 175, 177 n.1 (2003); *Tip Top Constr., Inc. v. United States*, No. 08-352C, 2008 WL 3153607, at *10 (Fed. Cl. Aug. 1, 2008), *aff'd*, 563 F.3d 1338 (Fed. Cir. 2009).

The RFP clearly required each proposal to stand on its own. (AR 1570 ("Proposals will not be compared against each other at any point in the source selection process, except in comparing cost/price should the information be appropriate to assist the SSA and/or the [Contracting Officer] in the performance of their responsibilities.).) Eschewing comparisons of proposals does not, however, sanction disparate or unequal treatment.

In this regard SAIC asserts that it was rated more harshly than others for similar perceived weaknesses which resulted in SAIC's Unacceptable rating. [31] While disagreeing that weaknesses were unequally graded, defendant and intervenors do not contend the inquiry is improper.

> "Substantively indistinguishable" deficiencies must be evaluated evenly.
>
> [A] "contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp. of America v. United States*, 56 Fed. Cl. 377, 383 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004). Equal treatment, however, does not require that all proposals be treated the same. See 48 C.F.R. § 1.102-2(c)(3) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same."). In particular, "a contracting officer has broad discretion in determining competitive range, and such decisions are not disturbed unless clearly unreasonable." *Birch & Davis Intern., Inc. v. Christopher*, 4 F.3d 970, 973 (Fed. Cir. 1993). Technical ratings of proposals are "discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.*, 77 F.3d at 449.
>
> This court has held that unequal treatment claims are the "quintessential examples of conduct which lacks a *rational basis*." *Hunt*, 61 Fed. Cl. at 273 (emphasis added). Therefore the relevant inquiry here is whether the "Air Force unreasonably downgraded

---

[31] SAIC does not contend that the ratings or contract award to any of the awardees should be set aside. Moreover, if a mistake were made in rating another, that would not lower the Solicitation standards for plaintiff. *Chenega Mgmt., LLC v. United States*, 96 Fed. Cl. 556, 586 (2010).

[Chenega's] technical proposal for deficiencies that are **substantively indistinguishable** from those found in the proposals of the other offerors who remained in the competitive range." *Id.*

*Chenega Mgmt, LLC v. United States*, 96 Fed. Cl. 556, 585 (2010) (second emphasis supplied).)

SAIC cites *BayFirst Solutions, LLC v. United States*, 102 Fed. Cl. 677 (2012) which found disparate treatment. Reliance is however, inapt. In *BayFirst*, objective requirements of the Solicitation such as providing resumes of key personnel were inconsistently applied. Also, plaintiff's proposal was considered late and in an improper computer format, where other offers were not so constrained. "This unequal treatment was quintessentially arbitrary and capricious." *See also Guzar Mirbachakot Transp. v. United States*, 104 Fed. Cl. 53, 67 (2012) ("Although the Army waived the solicitation's stated responsiveness criteria for other offerors, the Army refused to waive one of the solicitation's stated 'responsiveness' criterion, timeliness, for [the protestor].").

Further, SAIC's reliance on *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704 (2008) is misplaced. In *Femme Comp*, the agency rated one of the offerors based upon the responsibility given to its on-site project manager. Finding no "meaningful difference" between the "phraseology" used by other offerors treated more favorably, the court concluded the Army evaluated the proposals unequally, rendering the evaluation irrational. 83 Fed. Cl. at 743. Here no mirror-images have been presented.

The technical ratings SAIC seeks to compare emanate from subjective matters of substantial discretion and deference. Management deficiencies differ; they are neither substantially indistinguishable nor objective as in *BayFirst*. Challenge and second-guessing of gradation of weaknesses would eviscerate the Agency's discretion in technical evaluations. As opposed to unequal application of objective criteria such as size, resume requirements, submission deadlines, format and the like, the harsher grades about which SAIC complains are subjective factors and considerations within the quintessential discretion of the Army, particularly in this military contract with substantial national, indeed international, security concerns. *IBM Corp.*, 101 Fed. Cl. at 757 ("assignment of ratings is within the broad discretion [of the agency]" (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996))).

SAIC's challenges to grading of diverse deficiencies, primarily in management (Significant versus just plain Weakness) if sanctioned, would trump the Army's substantial subjective discretion to determine the effectiveness of management structures and the relative degree of risk to the government of different perceived deficiencies. Whether a concern is considered a Significant Weakness or a Weakness is well within the Army's discretion.

As detailed in the following categories, it is concluded that SAIC has not established disparity of treatment of deficiencies.[32] Even a variety of small or immaterial errors are not sufficient to invalidate a procurement decision. *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 960 (Fed. Cir. 1993. *See also Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed. Cir. 1994); *Gulf Group Inc. v. United States*, 61 Fed. Cl. 338, 358 (2004).

SAIC claims that, in the following categories, the Army rated flaws in its proposal more harshly than others.

**Management Plan**

SAIC reiterates that one of the reasons for its Significant Weakness rating for its proposed management was a perception of decentralization ("decentralized in the sense that it was not all located in the CONUS"), yet the Strength rating given to ▬▬▬▬▬▬▬▬▬ included praise for its SrPM being in the United States and its TOPM in the foreign sphere, an example of less than fair and equal evaluation. (Pl.'s Mot. J. AR 8, ECF No. 78.)

However, as previously discussed, this particular Significant Weakness rating was not a question of continental divide, but concern over SAIC's internal management including joint oversight – that SAIC's plan that dispersed responsibility and accountability of contract tasks to "multiple members of the team." (AR 1827.)

---

[32] SAIC in its Reply argues that because other proposals are not in the AR, substantial identity cannot be determined, preventing SAIC from presenting a disparate evaluation claim. As noted however, the identity required however, is not of proposals but of deficiencies. *Chenega Mgmt.*, 96 Fed. Cl. at 585. No authority is cited that in the circumstances presented here, the proposals of other offerors would be required to evaluate potential claims of disparate treatment.

On the other hand, the rating about which SAIC claims foul is a three-line snippet of a more than six single-spaced commentary on Strengths in ███████ Management Plan following a four-and-a-half pages of Significant Strength commentary. These deficiencies were not substantively identical.

Similarly, SAIC contends that ████ received a less harsh Weakness rating for essentially the same "decentralized" management structure considered to be a Significant Weakness in SAIC's proposal. However, the SSEB's focus was on SAIC's own management with "numerous internal staffing process issues requiring deconfliction and diverting senior management attention from actual contract performance." (AR 1827.) The concern that prompted ██████ Weakness rating was not on internal management structure but for an administrative reporting requirement that included submissions directly to the Agency rather than submitting them only to ████, which was cited as significantly increasing the burden on the government to evaluate overall performance. (AR 1783.) This deficiency was perceived as an efficiency issue with subcontractor reporting rather than a fundamental structural management concern and presumably could be easily remedied. These concerns were not identical or substantially indistinguishable.

SAIC also claims the rating deduction for ████ included only a single reference to subcontractor management even though ███ proposed to subcontract out 40 percent of linguist services. In contrast, subcontractor management in SAIC's proposal received considerable attention in both Management and Technical evaluations. Also ████████████████████████████████ received Weaknesses concerning lines of authority whereas SAIC was given a Significant Weakness. (Pl.'s Mot. J. AR 8-9, ECF No. 78-2.) For lack of clear lines of authority ██████ was given a Weakness in the Technical rather than the more heavily-weighted Management Factor. Again, these subjective and diverse evaluation determinations of risk to the government are well within the substantial discretion of the Agency and not for the court to second-guess.

SAIC concludes the voiced concerns about ██████ proposal to broadly delegate to its entire ██ subcontractor team the responsibility to report directly to the Army was substantially indistinguishable from evaluation of SAIC's management structure as significantly increasing risk to the government, citing *Chenega Mgmt.*, 96 Fed. Cl. 556, 585. (Pl.'s Resp. Def.'s Mot. J. AR 14, ECF No. 92.) ███████ delegation of responsibility to its ███ subcontractors for "submit[ting] reports directly to the Army,"

would significantly increase the burden on the Government to gain a complete view of the prime's overall performance and would "significantly increase[] the risk to the Government." (AR 1783.) However, if all perceived defects in proposals that would "significantly" increase the burden on, and the risk to, the government must result in the same rating regardless of the subject, this would eliminate Agency discretion. Identity of adjectives does not require identity of ratings.

Identified rating disparities of deficiencies are of the Agency's evaluation of complex management structures, technical matters of substantial discretion. In the circumstances presented, whether perceived risks to the government of a management structure was rated by the evaluators as a Significant Weakness, a Weakness, or another rating, are matters of substantial technical discretion.

**TOPM Authority and Responsibility**

SAIC asserts that the Army rated ▆▆ with a Weaknesses for its proposed location of its TOPM CONUS and its ATOPM OCONUS, but SAIC was given a Significant Weakness for the same arrangement. SAIC's proposal was criticized for (1) not making the TOPM "accountable" for any aspect of contract performance and responsible for only a few and (2) ▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆ (AR 1827-28.) The "Weakness" that the Army assigned to ▆▆▆▆ concerned the physical location of its TOPM and ATOPM – that is the practical concern of being able to communicate quickly to address situations during performance, making comparison for claims of disparate treatment inapt.

SAIC also compares its evaluation on this point to that of ▆▆▆▆▆▆ which received a Strength for delegating authority and responsibility to its first-line supervisors while SAIC did not. Again the underlying deficiencies have not been established as even approaching virtually indistinguishable such as to constitute unequal treatment. The Strength rating was under the Technical, not the Management Factor (AR 1844), and ▆▆▆▆▆▆, unlike SAIC, did not restrain authority of in-country personnel because it allowed "decision making to occur at the lowest supervisory level" (*Id.*) which differed from the concern over SAIC's TOPM lack of authority.

▆▆▆ received a Weakness rating under the Technical subfactor because its TOPM lacked sufficient "experience and expertise to manage a linguist workforce of

over 7,600 personnel in a geographically dispersed hostile environment and a budget that could exceed $1B per year." (AR 1872.) The SSEB determined that this "presents an increased risk level to the government in successfully executing the program and making informed decisions." (*Id.*) SAIC complains of unequal treatment in that the same defect in its proposal was rated under the more highly-weighted Management or Staffing Plan's Subfactor.

However, in addition to the negative rating under the Technical subfactor, ▮ ▮ received a Weakness rating in the more heavily-rated Staffing Plan subfactor because of concerns over the experience of its proposed TOPM. "The TOPM is a contingent hire from ▮▮▮▮▮▮▮▮. The TOPM experience is with small focused teams and not in managing personnel movements of the size and complexity of STO Charlie." (AR 1815.) Furthermore, the Army's concern over SAIC's proposal was structural – i.e., SAIC's TOPM position was "not accountable for anything;" would be "responsible for only a few aspects of performance;" would be constrained by the CONUS based staff/PM and was profoundly disempowered, essentially "limited to a subcontractor integrator role within the supported theater, without the actual authority to make subcontracting decisions." (AR 1827-28.) These concerns or deficiencies would cause "significant problems" and "present[] significant risk[s] to the Government." (*Id.*) These concerns were not equal.

### eTools

To reiterate, one Significant Weakness SAIC received in its Management Plan concerned its reliance on its ▮▮▮▮▮▮. SAIC claims disparate treatment as ▮▮▮▮▮ received a Significant Strength and a Strength for its web-based Collaborative Management System (CMS), and ▮▮▮▮▮ received a Significant Strength for requiring its subcontractors to conform to its processes while SAIC received Significant Weaknesses.

The cited rationale for SAIC's Significant Weakness was not the fact that a ▮▮▮▮▮ would be used but what information would be communicated to and through that ▮▮ ▮▮▮▮ subcontractors would recruit, screen and hire linguists through this ▮▮ and would have to adapt their processes to work with that ▮▮. "[T]his approach brings in significant complexity, interoperability issues, and

management inefficiencies that impact SAIC's ability to rapidly respond to linguist service type requirements." (AR 1828.)

However, the Army's evaluation and Significant Strength rating given to ████████████ was much broader than its use of computer technology:

> ████████████████ requires all subcontractors to follow ████ established management procedures and its integrated management approach for planning, directing, and controlling subcontracted opportunities. The PM conducts periodic subcontractor management reviews to evaluate subcontractor performance with appropriate functional managers. ████ identifies potential subcontractor performance problems through these periodic reviews, and takes corrective action before they impact the mission. Subcontractor performance is also reviewed before exercising option periods that may be contained in the subcontract. V.2 - pg 2-10/11 - para 2.1.3 and 2.1.3.2[.]

(AR 1790.)

Moreover, evaluation included the Army's observation that SAIC's proposal did not in fact require "all subcontractors to follow [SAIC]-established management procedures and its integrated management approach for planning, directing, and controlling subcontracted opportunities." (*Id.*) To the contrary, the Army found, among other things, that the "[s]pecific processes at the ground level are determined by each of the subcontractors, with SAIC attempting to build a higher level framework process using SAIC ████████ that the ██ subcontractors can adapt the output of their processes to." (AR 1828.)

SAIC also claims unequal treatment in that ████ received a Strength for making information available to the Contracting Officer's Representative (COR) and Contracting Officer (KO) through the ████████ (AR 1782-83), which contrasts with the criticism it received over reliance on its ████████. The Army's mention of ████████ was in a much broader context:

████████████████████████████████████████████
████████████████████████████████████████████

- 76 -



(AR 1782-83.) The Army's Strength related to complex ███████ that happens to be available online and is not comparable to SAIC's subcontractors use of its ███ to recruit, screen and hire linguists.

In support of its claims of disparate treatment, SAIC points out that subcontracting was encouraged and that other offerors had at least as many subcontractors as SAIC proposed. From this, disparate treatment is concluded. Notwithstanding the context in which the Army mentioned the number of subcontractors that would be hired through SAIC's █████, SAIC contends unequal treatment in that the six awardees relied on numerous subcontractors: █ for ██, █ for ████████, █ for ██, █ for ███ and more than █ for ██. They all received Weaknesses, not a Significant Weakness like SAIC. (Pl.'s Mot. J. AR 13, ECF No. 78-1.) The complex evaluations presented in the AR and determinations of adjectival ratings were not determinative solely on the number of subcontractors proposed. The RFP required subcontractors "perform seamlessly within the framework of the contract." (AR 799.) Accordingly, evaluation focused not on the number of subcontractors but on the offerors approach to manage the subcontractors "seamlessly." No predicate substantive identity of evaluative treatment is presented in these conclusory statements.

**Provision of a sufficient number of linguists**

SAIC's Management Plan received a Significant Weakness because its proposal did not describe its approach to identifying or providing a sufficient number of linguists other than ████████. (AR 1828.)

In comparison, ▮ was rated with a Significant Weakness and a Weakness, but under the less-heavily weighted Technical factor because (1) ▮ could provide only 150 candidates per week or 1,800 within the 90-day fill rate period; (2) "[i]f no incumbent exists or if less than 5,800 incumbent personnel move to ▮, then ▮ will not be capable of meeting PWS requirement;" and (3) ▮ did not explain how it could perform with less than 7,597 linguists. (AR 1846, 1848-49.)

SAIC's rating was based in part on its proposal to ▮ to identify numbers of linguists needed. In contrast, cited comments about ▮s proposal were in connection with ability to rapidly deploy, not to its approach to identifying sufficient numbers of linguists. Moreover, the Army's concerns about ▮ meeting the PWS requirement was in the Technical Factor, Subfactor 2.2 STO Charlie (AR 1848-49.) Neither the deficiencies nor the evaluative rationales were substantively indistinguishable.

Concerning its rating in Management Factor, Subfactor 1.3, Transition Plan, SAIC alleges that, "[w]hile SAIC was assessed a Weakness for having linguist candidates in its well-stocked candidate pipeline, ▮ and ▮ received Strengths for stating they had qualified candidates in their pipelines." (Pl.'s Mot. J. AR 30, ECF No. 78.) However, SAIC's Weakness rating was not for having a "well-stocked candidate pipeline." Rather, the Army's rating of this deficiency was because it could not determine whether SAIC had sufficient linguists in its pipeline:

> Figure 4-8 indicates only ▮ candidates in the pipeline to support STO Charlie, the original access to ▮ linguist[s] in Management Plan was downgraded to a ▮ linguist[s] database in the Staffing Plan, and now the Transition Plan states only ▮ linguist are in pipeline. . . . The lack of consistent numbers of linguists available . . . significantly increases risk to the Government.

(AR 1833.) No disparate treatment of deficiency or strength is stated.

▮ was given a Strength rating for proposing to consult with INSCOM about staffing needs, yet SAIC's plan to ▮ was given a Significant Weakness – another example of alleged disparate treatment. However, the evaluation of ▮ proposal in this regard was broader than characterized by SAIC. Consultation with INSCOM was only part of ▮ approach to identifying

sufficient quantity of linguists. SAIC's rating was based on ████████
████ being the only identified method of anticipating numbers of linguists.
These differences take the two evaluations outside the realm of substantively
indistinguishable.



(AR 1852.)

**Insufficient staffing levels**

SAIC was given Significant Weakness because its ████████ labor level in
the Chart of Proposed Labor Mix and Hours was deemed to be insufficient to
████ a contract and task order of this magnitude with the number of
subcontractors proposed. (AR 1831-32.) For not providing the number of hours and
labor mix for ████████ personnel, SAIC received a Marginal rating. (*Id.*)
SAIC's proposal was rated as "Marginal" in this subfactor. (AR 1831.)

In comparison SAIC points to "significant shortcomings regarding the proposed labor mix and hours" noted as defects in the proposals of ▮▮▮▮▮▮ ▮▮▮▮▮▮ and ▮▮▮. (Pl.'s Mot. J. AR 17, ECF No. 78-2.)

▮▮▮▮ shortcoming leading to a Weakness rating was because its proposed linguist hours/mix was not complete and did not include linguists to be provided by ▮▮▮ subcontractors. (AR 1785-86) SAIC didn't include any linguists.

These deficiencies were not established to be substantively identical. SAIC's Significant Weakness rating was based on several flaws in its proposal: (1) it only proposed labor mix and hours for ▮▮▮▮▮▮ staff; (2) that ▮▮▮▮▮▮ staffing was clearly insufficient for the size of the contract; (3) it did not address the labor mix and hours for ▮▮▮▮▮▮▮▮▮▮▮▮. (AR 1831-32.)

**"Proven" management plan**

One of the Weaknesses SAIC received in the Management Factor, Subfactor 1.1, Management Plan, was because it had never "implemented a management plan involving over 7,600 personnel in an austere contingency environment with little or no local infrastructure to depend upon." (AR 1829.) SAIC claims its experience which included management of hundreds of millions of dollars in Iraq and Afghanistan should have been rated on par with ▮▮▮▮ management plan which received a Strength rating for the same Subfactor. ▮▮▮▮ rating however was considered proven with "over ▮▮▮ linguists" in Afghanistan on a "contract which exceeds ▮▮." (AR 1781.) The underlying bases for the respective ratings are clearly dissimilar.

Suggesting that it should have been rated higher, SAIC also claims that ▮▮▮ received only a Weakness rating in Management Factors, Subfactor 1.1 Management Plan, and its past contract experiences were "all valued well under ▮▮▮▮" and "▮▮▮ does not specify having ever managed a contract or task order involving more than ▮▮▮ personnel ▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (AR 1769.) However, ▮▮▮ Weakness rating was, in part, because its experience involved "contingency operations in Iraq and Afghanistan." (AR 1769.) Moreover, in a separate Strength rating in that same Subfactor, ▮▮▮ was noted to have a robust pipeline of linguists, the Army commenting that ▮▮ had "deployed, integrated, and supported over ▮▮▮ personnel in Iraq and Afghanistan." (AR 1768.) SAIC adds that the disparity is even

more egregious because ███ was found to ████████████████ in the Past Performance Factor. (AR 1987, 1958.) The Past Performance Factor, given lesser weight than the Management Factor, and conducted by a different evaluation team, does not create the substantially indistinguishable nor disparate application of objective factors for the court to entertain a request to second-guess these technical ratings. Moreover, the Past Performance Evaluation Panel noted that ███ past experience included ████████████████████████████████

(AR 1987.) SAIC's suggestion that its past management experience was treated differently lacks credence.

SAIC also contends that the Army found ████████████ had a proven management plan without mentioning the number of linguists involved (AR 1793), and cited to ████████████ experience as a lead integrator of a $920M contract with 183 task orders and 144 subcontractors. (*Id.*) SAIC had linguist contracts and larger integrator contracts, but received no credit for a proven management plan. However, while the Army did not mention the number of linguists involved in ████████████ prior contracts, those contracts were mentioned by name and

described as involving a myriad of linguist contracts and relayed that  had provided linguist services in Saudi Arabia, Africa, Iraq, Afghanistan, Bosnia, Diego Garcia and Kosovo and had "established facilities and infrastructure in 58 countries and a presence in 83 countries." (*Id.*) Again, these subjective determinations as to the technical ratings of risks to the government are not subject to judicial review in the circumstances presented and claims of unequal treatment are not valid.

### No ████████ until after TO award

SAIC received a Weakness in both the Management Plan and Staffing Plan Subfactor because its ██████ would also serve as its ████████ until the issuance of a first TO. (AR 1829, 1832.) The Army stated that no individual name or resume was provided for the ████████ position, and that because of the size and scope of STO-Charlie, all IDIQ key personnel should be in place. The Army determined that this vacancy in SAIC's proposal presented an increased risk to the government. (AR 1832.)

In comparison, SAIC points out that the top manager for ████ would work part time, the rest of his time serving as President and General Manager of ████ and for this ████ did not receive a Weakness rating in its Transition Plan, but only a Weakness in the less heavily-weighted Staffing Plan. (AR 1764.) Similarly, ████ received a Weakness in the Management Plan for dual-hatting a senior management position. Lack of a resume of a key person was merely noted as an item for discussion and that person was triple-hatted. (AR 1838-39.) And although Linc proposed "contract-level Key Management Personnel" without defining roles and responsibilities, and assertedly without resumes, ████ received only a Weakness in the less-heavily-weighted Transition Plan. (AR 1772-73.) The Army's comment on this perceived deficit was the lack of discussion or definition in the proposal. (AR 1773.) Whether this included lack of resumes is unclear but ultimately irrelevant. There is simply not a basis for judicial interference with the Army's subjective evaluations. Substantial identify of deficits evaluated has not been established.

### Customer feedback

SAIC's Management Plan Subfactor received a Weakness because it relied on the customer to assess linguist quality. (AR 1829.) Comparison is made ████████

██████████   Management Plan that was credited with a Strength for timely identification of customer satisfaction problems. (AR 1795.) Also, ██████ was credited with a Strength rating in its Management Plan Subfactor for including customer feedback in its quality control process. (AR 1752.) These evaluations did not indicate that customer feedback would be the primary judge of and vehicle for improvement of the quality of translation services, precluding the unequal treatment SAIC advocates.

To monitor performance ████████████████ establishes a Quality Assurance Plan (QAP) by 'analyzing program goals and performance requirements to set standards and implement the processes designed to maintain ISO 9001:2008 standards.'[33] This process allows ██████████████ to 'set guidelines for timely identification and measurement cost, staffing, schedule, and satisfaction issues and resolutions, and provides the means for incorporating continuous improvement.' █████████████ methodology provides the means for the TOM to deliver quality service and evaluate results of linguist support and contract execution. █████████████ ISO-based staffing procedures and control mechanisms provides a consistent, standardized approach across the DLITE program. V.2 - pg 2-8 - para 2.1.2.4.1[.]

████████████████ provides a good process for subcontract management with an emphasis on continuous process improvement. In the case of poor performance, [████████████████] and subcontractor develops [sic] a corrective plan and measure performance against that plan. ████████████ institutes correction actions for continued non-performance (withhold payment, liquidated damages, termination for default and partial payment). V.2 - pg 2-10 – para 2.1.3 Figure 2.1-5[.]

(AR 1795.)

---

[33] The International Standards Organization (ISO) "develops and publishes international standards on a variety of subjects for agencies in 157 countries." *OSG Prod. Tankers LLC v. United States*, 82 Fed. Cl. 570, 579 n.15 (2008).

Although ███ received an overall Unacceptable rating, the Army concluding in part that its Management Plan "does not address how it will use and manage its subcontractors and does not detail any actual processes for risk mitigation by using merely conclusory terms." (AR 1752.) Notwithstanding its Unacceptable rating, ███ received one Strength rating in Subfactor 1.1 Management Plan which mentions the "methods of feedback." SAIC claims it too should have received a Strength.

> ███ states that it will incorporate central elements from its Quality Management System (QMS) (assignment of performance and oversight responsibilities, assignment of inspection duties and oversight authority, due dates, metrics, and methods of feedback and improvement) 'in all of its processes.' ███ states it will develop a detailed work breakdown structure (WBS), then price, schedule, and cost all work, using the WBS at the activity level. The WBS is used throughout performance of the entire Task Order. All of the major elements of the WBS contain quality controls. V.2 - pg 17/18 – para 1.2.4[.]

(AR 1752.)

The comparisons fail. The evaluated deficits and strengths are subjective and diverse.

**Linguist ███████**

The Army assigned a Weakness to SAIC's Management Plan because linguist openings would ███████ among SAIC internally and its subcontractors to select the best qualified candidate all through its ███████. While the Army acknowledged this process would produce cost savings to the Army, it would create "inherent time delays" in meeting government needs. (AR 1830.)

Unequal treatment alleged is the disparity between rating SAIC with a Weakness for using ███████ while ███████ received a Significant Strength for proposing to use its CMS portal to identify suitable linguists. ███████ proposed to use its system, which "tracks operational and business program data, including background, education, and skill-related data on thousands of linguists," to find a "best match" for each vacancy, to manage resources, to track "linguist metrics," and to review data on "program

performance metrics." (AR 1788.) The Agency's concern over SAIC's proposal to ███████ vacancies among subcontractors is not substantively indistinguishable.

### Non-performance processes

Because of perceived deficiencies in SAIC's proposal in assessing, monitoring and correcting subcontractor performance issues, the Army assessed a Weakness. (AR 1830.) In comparison, the evaluation of ████, which proposed to use subcontractors to perform 40% of the work, does not mention any system to track any performance issues. Mindful that SAIC proposed to use subcontractors to perform 100 percent of the linguist services, and that there is nothing in the RFP that required every aspect of these complex proposals be discussed, that the Agency did not comment on ████ process for monitoring subcontractor performance does not mean that SAIC was disparately treated.

### Linguist pipeline

SAIC received a Transition Plan Significant Weakness because of inconsistent statements about the number of linguists in its candidate pipeline, and because only four transition risks were identified for which questionable mitigation strategies were proposed. (AR 1832-33.) SAIC claims unequal treatment in that ████ and ████ received Strengths for stating they had qualified candidates in their pipelines.

The evaluators credited the qualified linguist candidates in ████ pipeline, as well as its "processes and procedures in-place for both a new start [TO] . . . and existing [TO]" and its "qualified [screened linguists] in the pipeline" for new TOs which "increases ████ ability to meet Government timeline requirements . . . and "reduces the risk to the Government," leading to a Strength rating. (AR 1836.) The "processes and procedures" noted included "an aggressive approach to language testing," prescreening, "written and oral tests using independent DOD-vetted language testers. (*Id.*) Further details of process and procedures spanning approximately a full single-spaced page of evaluative comments (AR 1835-36) further distance ████ Strength rating from the deficits noted in SAIC's proposal.

Similarly, what prompted ████ Transitional Plan Good rating with "adequate detail to indicate feasibility of approach and . . . an understanding of the problems ... with an overall low to moderate degree of risk in meeting the Government's

requirement" (AR 1786) was again, "processes and procedures in-place" found absent in SAIC's proposal.



### Commitment teaming agreements

SAIC received a Significant Weakness in its Management Factor, Transition Subfactor for not "discuss[ing] any agreement/commitment from these subcontractors that they will join SAIC" (AR 1833), yet ▮ was not downgraded for failing to explain how five "companies [on its team] will factor into the proposal, in particular, the extent of their partnership or how they will be managed." (AR 1814.)

These concerns, their treatment and the context in which the evaluative reasoning was made were not equivalent. The cited comments about ▮ were made in a broader discussion concerning its Management Subfactor as items for discussion.

 states in addition to the 12 SBs and 1 university teaming partners, that its team includes 5 foreign companies who are local national and third country national linguist providers ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ does not explain how these additional companies will factor into the proposal, in particular, the extent of their partnership or how they will be managed. (V2, 2.1.3, p2-24).

(AR 1814.)

██████ **Manager**

As previously concluded, the Army's determination that SAIC's dual-hatting of its ██████ manager with the duties of the task order project manager[34] "increases risk to project success," resulting in a Weakness rating under the Subfactor 1.3 Transition Plan (AR 1833), was not irrational, arbitrary nor capricious.

SAIC claims disparate treatment in that ██████ received a Subfactor 1.1 Management Plan Weakness (AR 1834-35) rating for assigning multiple roles but was not assessed a Weakness under the Staffing Plan subfactor, rather the multiple roles assigned was noted as a topic for discussion. (AR 1835-37.) (Pl.'s Mot. J. AR 32 , ECF No. 78-2.) The Agency's ratings of duties assigned to different personnel under different subfactors has not been shown to be unequal treatment of substantively equivalent deficits.

**STO Charlie Quality Control**

While the Army assigned SAIC an overall Marginal rating under the QCP Subfactor, a Weakness rating was given for relying "too heavily on ██████" without "physical verification and validation of what is actually happening on the ground from an unbiased source." (AR 1881.) SAIC received a second Weakness rating because the RACI Matrix for the QCP conflicted with the QCP submitted as part of the response to STO Charlie PWS and that "[t]he risk to the government of SAIC being capable of effectively integrating all ██████ subcontractors is high." (AR 1882.) In comparison, ██████ received a Strength because it proposed to monitor quality using its ██████. ██████ was also given a Strength for proposing to use its CMS portal to collect, manage, and report linguist related data for the DLITE IDIQ, including quality control information.

Technical ratings are a matter of substantial discretion. No authority has been cited that in the circumstances presented a Subfactor rating must be the sum of the number of Weaknesses or other adjectives thereunder regardless of severity or impact on the mission. SAIC complains that ██████ and ██████ were given Strengths and their proposals included ██████ information in

---

[34] "The TOPM's role is to execute the TO and to serve as the ██████ Manager for the TO." (AR 1040, Fig. 2-4.)

████. Unlike SAIC's offer, however, neither of those proposals raised concerns about the veracity or validity of the information being entered into the system so there was nothing unfair or disparate about the Agency's evaluation of these dissimilar proposals. As for the Weakness rating for its QCP, no substantively similar deficiency has been presented.

Concerning its overall Marginal rating for the QCP subfactor, SAIC argues that it was subjected to disparate treatment because others received better adjectives while having a similar number of weaknesses. SAIC had two Weaknesses and no Significant Weaknesses and received a Marginal rating. (AR 1881-82; Pl.'s Mot. J AR 36, ECF No. 78-2.) In comparison, ████ had two Significant Weaknesses and two Weaknesses yet received a higher adjectival rating of Acceptable. Also, ████ was rated Acceptable with two Weaknesses. (AR 1849-50.)

The Agency's discretion in these technical subjective evaluations and adjectival ratings is not like balancing weights on a scale. Neither rating decisions nor claims of unequal treatment are determined by the sum of adjectives. SAIC does not contend that these deficiencies were similar. FOR ████, the Agency noted that quality control at the IDIQ level was generic, but did not find fault with specificity in the TO QCP. (AR 1849.) The Agency concerns also included (1) ████ intent to have only three individuals "in-country" to monitor quality control, (2) the quality control manager reported to the project manager, and (3) the level of detail used to demonstrate a sustained quality improvement program. (AR 1849-50.) Similarly, ████ weakness concerned its plan to have quality control, "self-administered by the site managers on the ground which introduces a natural bias as site managers ... likely have their bonuses/salaries linked to successful performance." (AR 1884.) None of these deficiencies were mirror images or substantially similar to deficiencies and concerns in SAIC's proposal which included lack of reliability, internal conflicts in the proposal and potential problems managing subcontractors.

**Prejudice**

Even were it to be determined that any of the errors alleged have credence, more is required. *See Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1315-16 (Fed. Cir. 2009) (*citing Labatt Food Serv., Inc.*, 577 F.3d at 1380 (requiring that a plaintiff "show that it was prejudiced by a significant error" (i.e., "that but for the error, it would have had a substantial chance of securing the contract"); *Galen Med.*

*Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("'[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (*quoting Data Gen. Corp.*, 78 F.3d at 1562)). *See Info Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *Rex Serv.*, 448 F.3d at 1308 ("To prove a direct economic interest as a putative prospective bidder, [the protestor] is required to establish that it had a 'substantial chance' of receiving the contract." (citing *Myers*, 275 F.3d at 1370; *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996))). *Impresa Construzioni*, 238 F.3d at 1333.

SAIC concedes that to satisfy its threshold prejudice requirement, it must establish that it has a substantial chance of an award, and adds that its proposal should have been rated at least Acceptable or Good under both Management and Technical Factors. Considering SAIC's competitive price, it asserts, had SAIC's Management proposal been rated at lest Acceptable, SAIC's overall proposal would have been more highly rated than at least two of the six contract awardees which would have placed it above the clear-break line between awardees and non-awardees, satisfying the substantial chance for the award hurdle.

To reiterate, six IDIQ contracts were awarded because of the "clear break" in the quality of the proposals between the top six and the remaining five, with specific reference to the fact that all in that group received at least Good or Acceptable in all Management and Technical Factors.

> [A] clear quality break exists in the overall merit of offerors' proposals between the top six offerors' proposals, and the bottom five proposals. Specifically, the proposals of ███████████████████████ ██████████████ were rated as Good or Acceptable for both the Management and Technical evaluation factors--the two most important criteria--while the proposals of ██████████ ████████ were found to be Marginal or Unacceptable under one or both the Management and Technical evaluation factors.

(AR 1995.)

Adjectives in reverse order were: Unacceptable, Marginal, Acceptable, Good and Outstanding. In the following recap, SAIC's ratings are underlined with the

adjective creep necessary to elevate its ratings to at least Good or Acceptable, to be included above-the-line, in parentheticals:

> **Evaluation Criteria**
> 1. **Management Factor**: <u>Unacceptable</u> (to Marginal and then to Acceptable)
> - Subfactor 1.1 Management Plan: <u>Unacceptable</u> (to Marginal and then to Acceptable)
> - Subfactor 1.2 Staffing Plan: <u>Marginal</u> (to Acceptable)
> - Subfactor 1.3 Transition Plan: <u>Marginal</u> (to Acceptable)
> - Subfactor 1.4 Security Plan: <u>Acceptable</u>
> 2. **Technical Factor:** <u>Acceptable</u>
> - Subfactor 2.1 Technical Understanding and Capability: <u>Acceptable</u>
> - Subfactor 2.2 Sample Task Order: <u>Marginal</u> (to Acceptable)
> - Subfactor 2.3 Quality Control Plan: <u>Marginal</u> (to Acceptable)

All of these adjective jumps would have been necessary to include SAIC in the awardee group to establish prejudice. Any remaining unacceptable rating would be enough to torpedo the whole proposal.

Furthermore, SAIC's failure to challenge several of the assigned weaknesses further militates against the ratings jumps advocated. In the Management Factor, the most heavily weighted Factor and the category that lead to the Unacceptable rating (or alternatively, even if that Unacceptable rating were set aside), these unassailed Significant Weaknesses and Weaknesses preclude the elevation sought. Unchallenged evaluations include:

- Subfactor 1.1 Management Plan - Weakness: "Managing Subcontracting Opportunities. SAIC lists ■ subcontractors making up their 'team SAIC', however, they do not provide adequate information to evaluate the management/organizational structure of any of the proposed subcontractors. V.2 -pg 2-9 to 2-ll - figure 2-7." (AR 1830.)

- Subfactor 1.1 Management Plan - Weakness: "In addressing the management of deployment of linguists to OCONUS locations, SAIC merely states that the company takes prompt corrective measures, but

does not provide an approach to these corrective measures nor a plan to address substandard performance that risks not meeting quality, schedule, or cost requirements. V.2 - pg 2-13 -para 2.4.1.1." (*Id.*)

• Subfactor 1.2 Staffing Plan - Significant Weakness: "SAIC mentions an 'established database' of more than ███ language professionals that continues to grow, which along with incumbent capture, 'ensures we will reach a filled qualification standard within the TO specified transition period or within 90 days if no period is specified.' SAIC's ability to 'ensure' or 'guarantee' to reach a fill qualification standard can be impacted by many factors, to include its dependence on multiple subcontractors. SAIC does not factor in risks and anticipate mitigation of those risks. Nor does SAIC explain what their established database[] entails. V.2-pg 3-6-para 3.1.2[.]" (AR 1831.)

At bottom, SAIC's overall unacceptable rating prevents it from establishing it had any chance, much less a substantial chance of an award. *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 841 (1999) (offeror had "no further chance of award ... if it is technically unacceptable and would require major revisions to be made technically acceptable.")); *see also BlueStar Energy Servs., Inc. v. United States*, 100 Fed. Cl. 607, 617 (2011).

Even if its Management rating were to rise from Unacceptable to Marginal, the outcome would not change. No Acceptable Management Factor proposals received a Significant Weakness in its Management Plan, the Management Factors most important subfactor. (AR 1762-64 ███; 1767-69 ███; 1811-13 ███; 1834 ███.) ███, also awarded a contract had no Significant Weaknesses in its Management Plan and received a Good in both its Management Plan and its Management Subfactor. (AR 1781-83.) ███████████ received no significant weaknesses for its management plan which was rated overall outstanding with a good for its management factor. No awardee received a Marginal subfactor rating under the ████████. Moreover, even if SAIC's Management Factor rating rose to Marginal, SAIC would still have two Marginal subfactor ratings, a Good Performance, Moderate Risk Past Performance rating (which was not challenged) and a price that was higher than all but one awardee.

The court concludes that SAIC failed to meet its burden that the Agency's evaluation of SAIC's proposal was not in accordance with stated evaluation criteria or inconsistent with applicable law. While SAIC disagrees with many of the Agency's conclusions and resulting ratings, SAIC failed to establish that these conclusions lack a rational basis. Upon careful review of the record and arguments of counsel, SAIC has failed to establish (1) that its unacceptable rating lacked rationality or was in violation of procurement law; and (2) that it would have had a substantial chance of being included in the group of awardees even if more than an insubstantial number of the errors asserted were found to have validity. *See IBM Corp. v. United States*, 101 Fed. Cl. 746, 757-64 (2011) (denying merits of protestor's claims of error in adjectival ratings, disparate treatment and other claims in solicitation for multiple IDIQ contracts for software and IT products); *Standard Commc'ns, Inc. v. United States*, 101 Fed. Cl. 723, 731-32 (2011) (crediting agency rating determinations).

**Injunctive Relief**

Injunctive relief requires that "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). *See also PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987).

In that SAIC has not prevailed on the merits of its substantive claims, the first hurdle prerequisite to injunctive relief, inquiry is over. Nevertheless, that deficit aside, if an offeror is improperly deprived of a level playing field or excluded from the bidding process, the contractor is irreparably injured because no adequate remedy exists to make up for the contractor's potential loss of business. *BayFirst Solutions, LLC v. United States,* 102 Fed. Cl. 677, 696 (2012) (holding that "loss of the opportunity to fairly compete for a contract constitutes irreparable harm"); *see also BINL, Inc. v. United States*, No. 12-71, 2012 WL 2403551, at * 9 (Fed. Cl. June 19, 2012**);** *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 544 (2010); *Global Computer Enters. v. United States*, 88 Fed. Cl. 350, 452 (2009); *Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 791 (2009).

Neither the balance of hardships to the respective parties or public interest favor injunctive relief. Any harm to SAIC would be outweighed by the harm to the government if injunctive relief were granted, and injunctive relief would not be in the best interests of national security. *PGBA*, 389 F.3d at 1228-29 (holding that 28 U.S.C. § 1491(b)(4) "does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate . . . and does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award" and affirming the denial of injunctive relief in a post-award protest despite finding that the procuring agency committed prejudicial error).

SAIC retorts that reevaluation is not requested so there would be no delay to ongoing contracting; rather, "adding a seventh DLITE contract would only mean that the Army would have one more contractor proposing in response to Requests for Task Order Proposals to choose from, thus adding potential value to the stable of contractors capable of performing successful DLITE work. (Pl's. Reply 28-29, ECF No. 91.) Neither national security nor the public interest favor opening the stable door to add a contractor that the Army has rationally determined submitted an Unacceptable proposal with serious risks to the government of performing translation services to the war fighter. The substantial deference to the Army's highly technical, value-based determinations of the group of awardees as well as those proposals deemed risky, remains. "[P]roper consideration of [national security and the safety of our soldiers] alone requires denial of the requested injunctive relief," regardless of the merits of the protest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008); *see Yakus v. United States*, 321 U.S. 414, 441, 64 S. Ct. 660, 88 L. Ed. 834 (1944) (the Supreme Court's seminal opinion on the dominant role of public interest in consideration of any request for injunctive relief, explaining that the court may "go much further both to give and withhold relief in furtherance of the public interest" than it may "when only private interests are involved"). Indeed, Congress has codified this deference by directing the Court of Federal Claims to "give due regard to the interests of national defense and national security" when deciding bid protest cases. 28 U.S.C. § 1491(b)(3). *Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 403 (2008) (concluding that application of the statutory directive "militates against granting the [injunctive] relief sought").

Additionally, the substantial time that has lapsed since the contract awards militates against the relief sought. While judicial restraint in the circumstances

presented here is advisable, it is more compelling here because the bulk of the initial contract period has been performed. *See Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 522 (2012) (citing *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F. 2d 838, 846 (D.C. Cir. 1982)).

### CONCLUSION

For the reasons stated, SAIC's Motion for Judgment on the AR (ECF No. 78) is **DENIED**, and the Cross-Motions for Judgment on the Administrative Record filed by defendant, Global Linguistics and MEP on the AR (ECF Nos. 82, 84 and 85) are **GRANTED**. The clerk shall enter judgment accordingly.

s/ James F. Merow
James F. Merow
Senior Judge

## APPENDIX A

## ACRONYM GLOSSARY

| | |
|---|---|
| ACOR | ALTERNATE OR ASSISTANT CONTRACTING OFFICER REPRESENTATIVE |
| AR | ADMINISTRATIVE RECORD |
| APA | ADMINISTRATIVE PROCEDURE ACT |
| APM-ADMIN | ALTERNATE PROGRAM ADMINISTRATOR MANAGER |
| APM-OPS | ALTERNATE PROGRAM MANAGER OPERATIONS |
| AQL | ACCEPTABLE QUALITY LEVEL |
| BAH | BOOZ ALLEN HAMILTON |
| BBA-SME | BI-LINGUAL/BI-CULTURAL ADVISORS/SUBJECT MATTER EXPERTS |
| CA | CORRECTIVE ACTION |
| CACI | CACI PREMIER TECHNOLOGY, INC. |
| CAT | CATEGORY |
| CLPSO | CONTRACT LINGUIST PROGRAM SUPPORT OFFICE |
| CMS | COLLABORATIVE MANAGEMENT SYSTEM |
| CONUS | CONTINENTAL U. S. |
| COR | CONTRACTING OFFICER'S REPORT |
| CSF | CENTRALIZED SCREENING FACILITY |
| CSSO | CONTRACTOR'S SPECIAL SECURITY OFFICER |
| DLITE | DEPARTMENT OF DEFENSE LANGUAGE and INTERPRETATION TRANSLATION ENTERPRISE |
| DPM | DEPUTY PROGRAM MANAGER |
| EDR | ELECTRONIC DIGITAL RECORDING |
| EVM | EARNED VALUE MANAGEMENT |
| FO | FINANCIAL OFFICER |
| GLS | GLOBAL LINGUISTICS SOLUTIONS |
| IDIQ | INDEFINITE DELIVERY, INDEFINITE QUANTITY |
| IGCE | INDEPENDENT GOVERNMENT COST ESTIMATE |
| ILR | INTERAGENCY LANGUAGE ROUNDTABLE |
| INSCOM | UNITED STATES ARMY INTELLIGENCE AND SECURITY COMMAND |
| ISO | INTERNATIONAL STANDARDS ORGANIZATION |
| IT | INFORMATION TECHNOLOGY |
| JPAS | JOINT PERSONNEL ADJUDICATION SYSTEM |
| KMS | KMS SOLUTIONS |
| KO | CONTRACTING OFFICER |

L-3             L-3 SERVICES, INC.
LGS             LINC GOVERNMENT SERVICES, L.L.C.
LINC            LINC GOVERNMENT SERVICES, L.L.C.
LN              LOCAL NATIONAL
LOC             LINE OF COMMUNICATION
MEP             MISSION ESSENTIAL PERSONNEL, LLC
MSgt            MASTER SERGEANT
NGC             NORTHROP GRUMMAN TECHNICAL SERVICES, INC.
OCONUS          OUTSIDE THE CONTINENTAL UNITED STATES
OPS/PMO            ?
OSM             ONSITE MANAGER
PDF             PRE-DEPLOYMENT FACILITY MANAGER
PM              PROGRAM MANAGER
PMO             PROGRAM MANAGEMENT OFFICE
PPEP/PPET  PAST PERFORMANCE EVALUATION PANEL OR TEAM
PRS             PERFORMANCE REQUIREMENTS SUMMARY
PWS             PERFORMANCE WORK STATEMENT
QA/QC           QUALITY ASSURANCE/QUALITY CONTROL
QAP             QUALITY ASSURANCE PLAN
QASP            QUALITY ASSURANCE SURVEILLANCE PLAN
QC              QUALITY CONTROL
QCMGR OR QCM QUALITY CONTROL MANAGER

QMS             QUALITY MANAGEMENT SYSTEM
QCP             QUALITY CONTROL PLAN
QRC             QUICK REACTION CAPABILITY
RACI            RESPONSIBILITY, ACCOUNTABILITY, COORDINATION &
INFORMATION

RCFC            RULES OF THE COURT OF FEDERAL CLAIMS
RFP             REQUEST FOR PROPOSAL
RTOP            REQUEST FOR TASK ORDER PROPOSALS
SAIC            SCIENCE APPLICATIONS INTERNATIONAL CORPORATION
SB              SMALL BUSINESS
SBEP            SMALL BUSINESS EVALUATION PANEL
SCMGR           SUBCONTRACT MANAGER
SCRL            SPECIFIED CONTRACT REQUIRED LANGUAGE(S)
SLs             SITE LEADS
SPOT            SYNCHRONIZED PRE-DEPLOYMENT OPERATIONAL
TRACKER
SRPM            SENIOR PROGRAM MANAGER
SSA             SOURCE SELECTION AUTHORITY

| SSAC | SOURCE SELECTION ADVISOR COUNCIL |
| --- | --- |
| SSBI | SINGLE SCOPE BACKGROUND INVESTIGATION |
| SSEB | SOURCE SELECTION EVALUATION BOARD – HAD 4 PANELS |
| SSP | SOURCE SELECTION PLAN |
| STO CHARLIE OR STO C | SAMPLE TASK ORDER CHARLIE |
| TO | TASK ORDER |
| TOM | TASK ORDER MANAGER |
| TOPM | TASK ORDER PROGRAM MANAGER |
| USFOR-A | UNITED STATES FORCES AFGHANISTAN |
| WBS | WORK BREAKDOWN STRUCTURE |
| WWLR | WORLDWIDE LANGUAGE RESOURES |